# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| MICHAEL ELIAS et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>NISSAN NORTH AMERICA, INC., )<br><br>Defendant. ) | CASE NO. 3:23-cv-00348<br><br>JUDGE RICHARDSON |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is a motion to dismiss (Doc. No. 28, "Motion") Plaintiffs' first amended complaint (Doc. No. 24, "First Amended Complaint"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, filed by Defendant, Nissan North America, Inc. Defendant filed a memorandum in support of the Motion (Doc. No. 29, "Memorandum"), and Plaintiffs filed a response in opposition to the Motion (Doc. No. 34, "Response"), whereafter Defendant filed a reply in support of the Motion (Doc. No. 36, "Reply").

For the reasons provided herein, the Court will **grant in part and deny in part** Defendant's Motion. Specifically, as to the claims for fraudulent concealment (Count II), the Court will **GRANT** Defendant's Motion as to the claims of Plaintiff Hall and the Iowa class but will **DENY** Defendant's Motion as to the claims of the other Named Plaintiffs and the Nationwide Plaintiffs. The Court will further **DENY** Defendant's Motion as it relates to Counts I, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, and XV.

### <u>FACTS AS ALLEGED IN THE FIRST AMENDED COMPLAINT</u>[1]

---

[1] The facts contained in this section come from Plaintiffs' First Amended Complaint (Doc. No. 24). For purposes of the instant Motion and pursuant to the typical mechanisms of assessing motions under Federal

Plaintiffs Michael Elias, Kelly Wemer, James Gallina, Julie Gallina, Tesha Hall, Brian Lawson, and Montgomery Headley (collectively, the "Named Plaintiffs") filed the lawsuit on behalf of themselves and a proposed class of past and present owners and lessees of defective 2022-2023 Nissan Rogue vehicles ("Class Vehicles"). (Doc. No. 24 at p. 1). The Class Vehicles were "designed, manufactured, marketed, distributed, sold, warranted, and serviced by Defendant Nissan North America, Inc." (*Id.* at ¶ 1). The "Class Vehicles contain one or more defective components within its engine's Positive Crankcase Ventilation ("PCV") system that allows fuel to seep through porous rubber components resulting in strong gas fumes emanating from the engine compartment area into the vehicles' interior" ("Gas Fumes Defect"). (*Id.* at ¶ 2).

## I.   The Gas Fumes Defect

Defendant "began selling the Class Vehicles in or around October 2021, when [Defendant] introduced for the first time a 1.5-liter KR15DDT three-cylinder variable-compression turbocharged (VC-Turbo) engine" ("Engine"). (*Id.* at ¶ 87). The Engines are "defective and emit noxious gasoline odors that make driving the Class Vehicles unsafe, unpleasant and undesirable." (*Id.* at ¶ 89). More specifically, the "engine defect and resulting strong fuel odor throughout the interior of the vehicle makes Class Vehicle owners physically ill and is a fire safety hazard." (Doc. No. 24 at ¶ 3). Class Vehicle owners made complaints related to the Gas Fumes Defect,

---

Rule of Civil Procedure 12(b)(6), the Court accepts the facts alleged in the First Amended Complaint as true. But the Court does not accept as true any legal conclusions (even if couched as facts). As for any representation in the First Amended Complaint that the Court is *not* accepting as true, the Court generally identifies it by qualifying it (as, for example, by "Plaintiffs allege") to denote that it is not being taken as true but rather is set forth to indicate what Plaintiffs *claim* to be true. Throughout this Order, except as indicated in the next sentence, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even with the awareness that any such alleged fact may ultimately prove false. Having said that, at times when assessing whether Plaintiffs have alleged factual matter sufficient to support their respective claims, the Court does point out that it is basing its assessment on the facts alleged in the First Amended Complaint; in that particular context, the Court does use the phrase "Plaintiffs allege" to proceed the facts alleged, even though the Court is taking those facts as true for purposes of the Motion.

complaining that their "kids are getting sick and I am afraid my car will cause fire"; the "gas and fumes make me sick and my eyes water at times"; the "fumes are nauseating and cause headaches"; the "[s]mell is so strong it makes you feel light headed and gives you a headache [and raises] a huge health concern for me and my family"; and they experience "dizziness." (*Id.*). The Class Vehicles are unsafe because "whenever fuel vapor is present in an enclosed space, such as Class Vehicles' engine compartment or the garage where such vehicles are parked, such fuel vapor is highly combustible and one little spark is all that it takes to ignite such fuel vapors." (*Id.* at ¶ 90).

## II. The Named Plaintiffs' Class Vehicles

### A. Montgomery Headley

On July 2, 2022, Montgomery Headley ("Plaintiff Headley") purchased a Class Vehicle from Walser Nissan Coon Rapids ("Walser Nissan") in Coon Rapids, Minnesota. (*Id.* at ¶ 77). Walser Nissan is "an authorized Nissan dealership." (*Id.*). Neither Walser Nissan nor Defendant disclosed the Gas Fumes Defect at the time Plaintiff Headley purchased his Class Vehicle. (*Id.* at ¶ 80).

"Two months after [Plaintiff] Headley purchased his vehicle, he observed that after he drove the car and then parked it, the car emitted an intense smell of gasoline in the interior of the vehicle" (i.e., the Gas Fumes Defect). (*Id.* at ¶ 82). In the Fall of 2022, Plaintiff Headley took his Class Vehicle to Walser Nissan and complained about the noxious gasoline odor. (*Id.* at ¶ 83). "In response, Walser Nissan inspected [Plaintiff] Headley['s] [v]ehicle, advised [Plaintiff] Headley it found no fuel leak and returned the vehicle back to [Plaintiff] Headley." (*Id.*). Plaintiff Headley then took his vehicle to Miller Nissan ("Miller Nissan") in St. Cloud, Minnesota—another authorized Nissan dealership—and complained about the noxious gasoline odor. (*Id.* at ¶ 84). "In

response, Miller Nissan inspected the vehicle, confirmed that [the] gas fumes smell was a known issue, but [t]hat [Defendant] had no fix for this issue." (*Id.*).

On June 8, 2023, Plaintiff Headley sent a letter to Defendant advising Defendant that his (Plaintiff Headley's) Class Vehicle "suffered from the Gas Fumes Defect and had not been repaired under Nissan's warranties." (*Id.* at ¶ 85).

B.  Brian Lawson

On October 22, 2022, Brian Lawson ("Plaintiff Lawson") purchased a Class Vehicle from Shults Nissan Subaru ("Shults Nissan") in Jamestown, New York. (*Id.* at ¶ 67). Shults Nissan is "an authorized Nissan dealership." (*Id.*). Neither Shults Nissan nor Defendant disclosed the Gas Fumes Defect at the time Plaintiff Lawson purchased his Class Vehicle. (*Id.* at ¶ 70).

"Within the first few weeks after [Plaintiff] Lawson purchased his vehicle, he observed that after he drove the car and then parked, it emitted an intense smell of gasoline in the interior of the vehicle" (i.e., the Gas Fumes Defect). (*Id.* at ¶ 72). On April 13, 2023, Plaintiff Lawson took his Class Vehicle to Shults Nissan and complained about the noxious gasoline odor. (*Id.* at ¶ 73). "In response, Shults Nissan inspected the vehicle and confirmed that [the] gas fumes smell was a known issue." (*Id.*). Shults Nissan informed Plaintiff Lawson that there were no repairs available. (*Id.*). Plaintiff Lawson returned to Shults Nissan on April 29, 2023, again complaining about the noxious gasoline odor. (*Id.* at ¶ 74). Shults Nissan again inspected Plaintiff Lawson's vehicle "confirm[ing] again that [the] gas fumes smell was a known issue, but that [Defendant] had no fix for [the] issue." (*Id.*).

On July 6, 2023, Plaintiff Lawson sent a letter to Defendant advising Defendant that his (Plaintiff Lawson's) Class Vehicle "suffered from the Gas Fumes Defect and had not been repaired under Nissan's warranties." (*Id.* at ¶ 75).

C.     James Gallina and Julie Gallina

On November 26, 2022, James Gallina and Julie Gallina (collectively, "Gallinas") purchased a Class Vehicle from Woodfield Nissan ("Woodfield Nissan") in Hoffman Estates, Illinois. (*Id.* at ¶ 43). Woodfield Nissan is "an authorized Nissan dealership." (*Id.*). Neither Woodfield Nissan nor Defendant disclosed the Gas Fumes Defect at the time the Gallinas purchased their Class Vehicle. (*Id.* at ¶ 46).

"A little over a month after the Gallinas purchased their vehicle, they observed that when driving the car gasoline fumes would enter the interior of the vehicle" (i.e., the Gas Fumes Defect). (*Id.* at ¶ 48). On January 10, 2023, the Gallinas took their Class Vehicle to Woodfield Nissan and complained about the noxious gasoline odor. (*Id.* at ¶ 49). The Gallinas also expressed concern regarding "whether [the] gas fumes posed a fire risk," asking "what were the effects of such intense gas fumes on their health, and . . . whether the car was safe to drive." (*Id.* at ¶ 50). "In response, Woodfield Nissan inspected the vehicle, confirmed the vehicle smelled of gas, and stated that [the] gas fumes smell was a known issue but that [Defendant] had no fix." (*Id.* at ¶ 49). Woodfield Nissan did not answer the Gallinas' line of questions related to the safety of their Class Vehicle, instead telling the Gallinas that they "should pick up their car and await on a fix from [Defendant]." (*Id.* at ¶ 50).

Thereafter, "the Gallinas called Nissan Consumer Affairs and complained about the Gas Fumes Defect that [the] dealer would not fix." (*Id.* at ¶ 51). Furthermore, On February 7, 2023, the Gallinas sent a letter to Defendant and Woodfield Nissan advising them that their Class Vehicle "continues to suffer from the Gas Fumes Defect, that their vehicle continues to smell of gas, that their garage continues to smell of gas, and [that they] requested a repair." (*Id.* at ¶ 52). Finally, on February 22, 2023, the Gallinas sent a letter to Defendant advising Defendant that their Class

Vehicle "suffered from the Gas Fumes Defect and had not been repaired under Nissan's warranties." (*Id.* at ¶ 53).

The Gallinas went to Woodfield Nissan two times—once on March 2, 2023, and another time on April 13, 2023—complaining about the noxious gasoline odor. (*Id.* at ¶¶ 54-55). Both times, Woodfield Nissan made unsuccessful repair attempts by installing different PCV Valves/Ventilation hoses supplied by Defendant. (*Id.*).

> D.      Michael Elias

On December 3, 2022, Michael Elias ("Plaintiff Elias") purchased a Class Vehicle from Jeffrey Automotive Group, Inc., ("JAG") in Roseville, Michigan. (*Id.* at ¶ 21). JAG is "an authorized Nissan dealership." (*Id.*). Neither JAG nor Defendant disclosed the Gas Fumes Defect at the time Plaintiff Elias purchased his Class Vehicle. (*Id.* at ¶ 24).

"Shortly after [Plaintiff] Elias purchased his vehicle, he observed that after he drove the car and then parked, it emitted an intense smell of gasoline in the interior of the vehicle" (i.e. the Gas Fumes Defect). (*Id.* at ¶ 26). On January 20, 2023, Plaintiff Elias took his Class Vehicle to JAG and complained about the noxious gasoline odor. (*Id.* at ¶ 27). "In response, JAG inspected the vehicle and confirmed that [the] gas fumes smell was a known issue." (*Id.*). JAG informed Plaintiff Elias that there were no repairs available. (*Id.*).

On March 3, 2023, Plaintiff Elias sent a letter to Defendant advising Defendant that his (Plaintiff Elias's) Class Vehicle "suffered from the Gas Fumes Defect and had not been repaired under Nissan's warranties." (*Id.* at ¶ 28). Plaintiff Elias returned to JAG two more times—once on May 1, 2023, and another time on June 13, 2023—complaining about the noxious gasoline odor. (*Id.* at ¶¶ 29-30). Both times, JAG inspected Plaintiff Elias's Class Vehicle and made unsuccessful repair attempts. (*Id.*).

E. <u>Kelly Wemer</u>

On December 16, 2022, Kelly Wemer ("Plaintiff Wemer") purchased a Class Vehicle from RPG Imports, LLC d/b/a O'Brien Nissan of Bloomington ("O'Brien Nissan"), in Bloomington, Illinois. (*Id.* at ¶ 32). O'Brien Nissan is "an authorized Nissan dealership." (*Id.*). Neither O'Brien Nissan nor Defendant disclosed the Gas Fumes Defect at the time Plaintiff Wemer purchased her Class Vehicle. (*Id.* at ¶ 35).

"A little over a month after [Plaintiff] Wemer purchased her vehicle, she observed that when driving the car gasoline fumes would enter the interior of the vehicle" (i.e., the Gas Fumes Defect) (*Id.* at ¶ 37). At the end of February 2023, Plaintiff Wemer took her Class Vehicle to O'Brien Nissan complaining about the gasoline odor in her Class Vehicle. (*Id.* at ¶ 39). "In response, O'Brien Nissan inspected the vehicle and confirmed that [the] gas fumes smell was a known issue but that [Defendant] had no fix." (*Id.*).

On March 2, 2023, Plaintiff Wemer sent a letter to Defendant advising Defendant that her (Plaintiff Wemer's) Class Vehicle "suffered from the Gas Fumes Defect and had not been repaired under Nissan's warranties." (*Id.* at ¶ 40). On March 30, 2023, Plaintiff Wemer tried to schedule a warranty repair appointment with O'Brien Nissan to resolve the Gas Fumes Defect, but "O'Brien Nissan refused to schedule a warranty repair appointment and claimed that there were [sic] no repair available." (*Id.* at ¶ 41).

F. <u>Tesha Hall</u>

On February 11, 2023, Tesha Hall ("Plaintiff Hall") purchased a Class Vehicle from Kunes of Davenport, Inc. d/b/a Kunes Nissan ("Kunes Nissan") in Davenport, Iowa. (*Id.* at ¶ 57). Kunes Nissan is "an authorized Nissan dealership." (*Id.*). Neither Kunes Nissan nor Defendant disclosed the Gas Fumes Defect at the time Plaintiff Hall purchased her Class Vehicle. (*Id.* at ¶ 60).

"Within weeks after Ms. Hall purchased her vehicle, she observed that when driving the car gasoline fumes would enter the interior of the vehicle" (i.e., the Gas Fumes Defect). (*Id.* at ¶ 62). On March 3, 2023, Plaintiff Hall took her Class Vehicle to Courtesy Moline—Nissan's authorized dealership in Moline, Illinois ("Courtesy Moline")—and complained about the noxious gasoline odor. (*Id.* at ¶ 63). "In response, Courtesy Moline inspected the vehicle and confirmed that [the] gas fumes smell was a known issue but that [Defendant] had no fix." (*Id.*). Courtesy Moline also gave Plaintiff Hall "a pamphlet dated January of 2023 confirming that [Defendant] was aware of the Gas Fumes defect but had no fix." (*Id.*).

On May 11, 2023, Plaintiff Hall sent a letter to Defendant advising Defendant that her (Plaintiff Hall's) Class Vehicle "suffered from the Gas Fumes Defect and had not been repaired under Nissan's warranties." (*Id.* at ¶ 65).

### III.    Nissan's Knowledge of the Gas Fumes Defect

Defendant allegedly became aware of the Gas Fumes Defect before it sold Plaintiffs their Class Vehicles.[2] (*Id.* at ¶ 96). Defendant learned of the Gas Fumes Defect through sources not available to Plaintiffs, including, but not limited to, the following:

> pre-production testing, preproduction design failure mode, and analysis data; production design failure mode, and analysis data; early consumer complaints made exclusively to Nissan's network of dealers, and directly to Nissan; aggregate warranty data compiled from Nissan's network of dealers; testing conducted by Nissan in response to consumer complaints; and repair order, and parts data received by Nissan from Nissan's network of dealers.

---

[2] The Court qualifies its statement of this fact with "allegedly" because it does not accept as true the assertion that Defendant had advance notice of the Gas Fumes Defect. In context, this allegation serves by itself essentially to establish an element of many of Plaintiffs' claims, and for this reason it is not appropriate simply to assume *ab initio* that this allegation is true. As discussed below, however, the Court finds that Plaintiffs have alleged adequate factual matter to render this assertion plausible, and so the assertion is adequate even though not assumed *ab initio* to be correct.

(*Id.* at ¶ 97). Furthermore, multiple other Class Vehicle Owners—i.e., those owners of Class Vehicles who are not the Named Plaintiffs—wrote about the Gas Fumes Defect on a "Nissan Rogue enthusiast website" (Doc. No. 24 at ¶¶ 105-109), "dozens of Class Vehicle owners voiced on Facebook their frustration with receiving no repair" for the Gas Fumes Defect (*id.* at ¶ 110), and Plaintiffs provided 72 examples of complaints filed by consumers with the National Highway Traffic Safety Administration ("NHTSA") regarding the Gas Fumes Defect (*id.* at ¶ 112).

Moreover, in January 2023, Defendant issued a document titled, "Nissan Talk Tip Rogue Fuel Odor, Reference: NTT/23-025" ("Nissan Talk Tip") to its authorized dealers. (*Id.* at ¶ 102). In the Nissan Talk Tip, Defendant "advised its authorized dealers that '[o]n some MY2022 and newer Nissan Rogue vehicles equipped with 3-cylinder engine, an odor of gasoline may be noticed in and/or around the vehicle with no Malfunction Indicator Lamp (MIL), or Diagnostic Trouble Codes (DTCs) stored.'" (*Id.*). Defendant further acknowledged that it was investigating the Gas Fumes Defect. (*Id.*).

On June 21, 2023, Defendant issued a Technical Service Bulletin titled "Fuel Odor" ("Fuel Odor TSB"). (*Id.* at ¶ 104). The Fuel Odor TSB applies to "2021-2023 Nissan Rogue Vehicles and instructs Nissan dealers to replace the PCV hose whenever owners complain of fuel odor and there is no malfunction indicator light lit and no diagnostic trouble codes stored." (*Id.*). As of the filing of their First Amended Complaint, Defendant had not "recalled the Class Vehicles to repair the Gas Fumes Defect, ha[d] not offered to its customers a suitable repair or replacement parts related to the Gas Fumes Defect free of charge, and ha[d] not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Gas Fumes Defect." (*Id.* at ¶ 116).

<u>PROCEDURAL BACKGROUND</u>

On April 13, 2023, Plaintiffs filed the original complaint (Doc. No. 1) to initiate the instant action. On August 14, 2023, Plaintiffs filed the First Amended Complaint, asserting therein twenty-five causes of action within fifteen counts. The following table identifies which Plaintiff(s) asserts which claim(s) in the First Amended Complaint:

| Plaintiff(s) | Cause of Action |
|---|---|
| All Plaintiffs[3] | Breach of Implied and Express Warranties Pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.* (Count I) |
| Plaintiff Wemer and the Gallinas (on behalf of themselves and the Illinois class) | Fraudulent Concealment pursuant to Illinois law (Count II) |
| Plaintiff Elias (on behalf of himself and the Michigan class) | Fraudulent Concealment pursuant to Michigan law (Count II) |
| Plaintiff Headley (on behalf of himself and the Minnesota class) | Fraudulent Concealment pursuant to Minnesota law (Count II) |
| Plaintiff Lawson (on behalf of himself and the New York class) | Fraudulent Concealment pursuant to New York law (Count II) |
| Plaintiff Hall (on behalf of herself and the Iowa class) | Fraudulent Concealment pursuant to Iowa law (Count II) |
| Nationwide Class | Fraudulent Concealment (Count II) |
| Plaintiff Wemer and the Gallinas (on behalf of themselves and the Illinois class) | Unjust Enrichment pursuant to Illinois law (Count II) |
| Plaintiff Elias (on behalf of himself and the Michigan class) | Unjust Enrichment pursuant to Michigan law (Count III) |
| Plaintiff Headley (on behalf of himself and the Minnesota class) | Unjust Enrichment pursuant to Minnesota law (Count III) |
| Plaintiff Lawson (on behalf of himself and the New York class) | Unjust Enrichment pursuant to New York law (Count III) |
| Plaintiff Hall (on behalf of herself and the Iowa class) | Unjust Enrichment pursuant to Iowa law (Count III) |
| Nationwide Class | Unjust Enrichment (Count III) |
| Plaintiff Elias (on behalf of himself and the Michigan class) | Michigan Breach of Implied Warranty of Merchantability, Mich. Comp. Laws Ann. § 440.2314 (Count IV) |
| Plaintiff Elias (on behalf of himself and the Michigan class) | Michigan Breach of Express Warranty (Count V) |
| Plaintiff Elias (on behalf of himself and the Michigan class) | Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § Ch. 445.911 (Count VI) |

[3] When indicating that "all Plaintiffs" are asserting a claim, the Court is indicating that the Named Plaintiffs assert the claim on behalf of themselves and the Nationwide Class.

| Plaintiff(s) | Cause of Action |
|---|---|
| Plaintiff Wemer and the Gallinas (on behalf of themselves and the Illinois class) | Illinois Breach of Express Warranty, 810 Ill. Comp. Stat. Ann. 5/2-313 (Count VII) |
| Plaintiff Wemer and the Gallinas (on behalf of themselves and the Illinois class) | Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Il. Comp. Stat. Ann. 505/1 (Count VIII) |
| Plaintiff Hall (on behalf of herself and the Iowa class) | Iowa Breach of Express Warranty, Iowa Code Ann. § 554.2313 (Count IX) |
| Plaintiff Hall (on behalf of herself and the Iowa class) | Iowa Consumer Frauds Act, Iowa Code Ann. § 714H.1 (Count X) |
| Plaintiff Lawson (on behalf of himself and the New York class) | New York Breach of Express Warranty, N.Y. UCC § 2-313 (Count XI) |
| Plaintiff Lawson (on behalf of himself and the New York class) | New York Consumer Protection from Deceptive Practices, N.Y. Gen. Bus. Law § 349 (Count XII) |
| Plaintiff Headley (on behalf of himself and the Minnesota class) | Minnesota Breach of Implied Warranty of Merchantability, Minn. Stat. Ann. § 336.2-314 (Count XIII) |
| Plaintiff Headley (on behalf of himself and the Minnesota class) | Minnesota Breach of Express Warranty, Minn. Stat. Ann. § 336.2-313 (Count XIV) |
| Plaintiff Headley (on behalf of himself and the Minnesota class) | Minnesota Consumer Fraud Act, Minn. Stat. Ann. § 325F.68 (Count XV) |

The Court consolidates the claims into four categories: (1) Plaintiffs' fraud-based claims (Counts II, III, VI, VIII, X, XII, and XV, "Fraud-Based Claims"); (2) Plaintiffs' breach-of-express-warranty claims (Counts V, VII, IX, XI, and XIV, "Express-Warranty Claims"); (3) Plaintiffs' breach-of implied-warranty claims (Counts IV and XIII, "Implied-Warranty Claims"); and (4) Plaintiffs' Magnuson-Moss Warranty Act claim (Count I, "MMWA Claims"). Defendant subsequently filed the instant Motion, arguing that Plaintiffs' claims should be dismissed.

LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendants' liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

Fed. Rule of Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity

to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *see also Herpst v. Parkridge Med. Ctr., Inc.*, No. E2017-00419-COA-R3-CV, 2018 WL 4052208, at *2-3 (Tenn. Ct. App. Aug. 23, 2018); *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018). "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 434 (6th Cir. 2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

<u>DISCUSSION</u>

As a preliminary matter, the Court must determine whether it can properly consider the exhibits attached to Defendant's Memorandum ("Exhibits"). The undersigned previously has explained the procedure for handling the attachment of evidence to a 12(b)(6) motion:

> Fed. Rule of Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *Doe*, 219 F. Supp. 3d at 652-53; *Blanch*, 333 F. Supp. 3d at 791-92. "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 U.S. Dist. LEXIS 200504, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018).

*Thompson v. Hendrickson USA, LLC*, No. 3:20-cv-00482, 2021 WL 848694, at *6 (M.D. Tenn. Mar. 5, 2021) (Richardson, J.).

Defendant attached to its Memorandum three exhibits: (1) the January 2023 Nissan Talk Tip (Doc. No. 29-1, "Exhibit 1" and "Nissan Talk Tip"); (2) the Technical Service Bulletin issued on June 21, 2023 (Doc. No. 29-2, "Exhibit 2" and "Technical Service Bulletin"); and (3) the 2023 Warranty Information Booklet (Doc. No. 29-3, "Exhibit 3" and "Warranty"). Although Plaintiffs do not dispute the Court's ability to consider the Exhibits when ruling on the Motion, the Court must nonetheless ensure such would be proper. Ultimately, the Court finds that it can appropriately

consider the Exhibits when ruling on the Motion, because they were both referred to in Plaintiffs' First Amended Complaint and central to the claims therein.

The Exhibits were both referred to in Plaintiffs' First Amended Complaint and central to the claims therein. More specifically, Plaintiffs refer to the Nissan Talk Tip (i.e., Exhibit 1) and the Technical Service Bulletin (i.e., Exhibit 2) in support of their assertion that Defendant knew about the Gas Fumes Defect before Defendant sold Plaintiffs their Class Vehicles. (Doc. No. 24 at ¶¶ 96 and 102-104). Importantly, for Plaintiffs to succeed on their fraudulent concealment claims (Count II), Plaintiffs have to sufficiently allege that Defendant had knowledge of the Gas Fumes Defect prior to the sales of the Class Vehicles. *Infra* pp. 18-33, Section I.A. Therefore, because Exhibits 1 and 2 were referred to and used as support for the assertion that Defendant had pre-sale knowledge of the Gas Fumes Defect, the Court finds that Exhibits 1 and 2 are central to Plaintiffs' claims—specifically Plaintiffs' Fraud-Based Claims.

Likewise, the Warranty (i.e., Exhibit 3) is referred to at length in Plaintiffs' First Amended Complaint. (*Id.* at ¶¶ 23, 34, 45, 59, 69, 79, 168, 170, 192, 194, 216, 218, 241, 243, 270, and 272). Plaintiffs discussed the terms of the Warranty and ultimately alleged that Defendant failed to comply with the terms of the Warranty. Because Plaintiffs bring multiple claims centered on violation of the Warranty (First Cause of Action, Fifth Cause of Action, Seventh Cause of Action, Ninth Cause of Action, Eleventh Cause of Action, and Fourteenth Cause of Action), the Court has no problem finding the Warranty is central to Plaintiffs' claims.

Accordingly, because the Exhibits were referred to in Plaintiffs' First Amended Complaint and central to the claims therein, the Exhibits can be considered and the Motion need not be converted into one for summary judgment.

The Court will next address Plaintiffs' Fraud-Based Claims, Breach of Express-Warranty Claims, Breach of Implied-Warranty Claims, and Magnuson-Moss Warranty Act Claims in turn.

## I. Fraud-Based Claims (Counts II, III, VI, VIII, X, XII, and XV)

Plaintiffs' Fraud-Based Claims encompass Plaintiffs' claims for breach of state consumer protection laws (Counts VI, VIII, X, XII, and XV), fraudulent concealment (Count II), and unjust enrichment (Count III)—all of which are predicated on Defendant's alleged fraudulent behavior in the form of failing to disclose the Gas Fumes Defect. (*See e.g.* Doc. No. 24 at ¶¶ 154 (Unjust enrichment claims arose "[a]s a result of its fraudulent acts, and omissions related to the Gas Fumes Defect"), 179 ("By failing to disclose and concealing the Gas Fumes Defect from Plaintiff Elias and Michigan Class Members, Defendant violated the Michigan Consumer Protection Act. . . ."), 204 ("By failing to disclose and concealing the Gas Fumes Defect from Plaintiffs Wemer and Gallinas and Illinois Class Members, Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act. . . ."), 229 ("By failing to disclose and concealing the Gas Fumes Defect from Plaintiff Hall and Iowa Class Members, Defendant violated Iowa CFA. . . ."), 253 ("By failing to disclose and concealing the Gas Fumes Defect from Plaintiff Lawson and New York Class Members, Defendant violated the N.Y. Gen. Bus. Law § 349, *et seq.* . . ."), 283 ("By failing to disclose and concealing the Gas Fumes Defect from Plaintiff Headley and Minnesota Class Members, Defendant violated the violated the Minnesota Consumer Fraud Act. . . ."), 138-39 (Nissan committed fraudulent concealment "[b]y failing to disclose and concealing the Gas Fumes Defect from Plaintiffs and Class Members, Defendant concealed and suppressed material facts concerning the performance and quality of the Class Vehicles" and "Defendant was under a duty to Plaintiffs and the Class Members to disclose the Gas Fumes Defect and/or the associated repair costs. . . .")).

Defendant argues that the claims[4] for fraudulent concealment—and relatedly the Fraud-Based Claims as a whole—should be dismissed for two alternative reasons: "(1) Plaintiffs have not alleged [that Defendant] knew about the purported defect when Plaintiffs purchased their vehicles[5] and, [sic] (2) [Defendant] did not owe Plaintiffs a duty to disclose." (Doc. No. 29 at 11). (The Court refers to these respectively as "Defendant's Knowledge Argument," and "Defendant's Duty-to-Disclose Argument").[6] Furthermore, and in addition to the two aforementioned arguments, Defendant proffers a third, alternative argument for why the unjust enrichment claims[7] in particular should be dismissed—namely, that those claims are "[p]recluded [b]y the [e]xistence of an [e]xpress [w]arranty." (*Id.* at 17). The Court will address the viability of each argument in turn.

---

[4] The Court refers to Count II as the "fraudulent concealment *claims*" (plural), rather than the "fraudulent concealment *claim*" (singular) because although Plaintiffs pled only one count of fraudulent concealment, such is pled on behalf of each Named Plaintiff and the Nationwide Class. Therefore, the Named Plaintiffs and the Nationwide Class have effectively each pled a claim of fraudulent concealment. Hereinafter, when referencing the claims of fraudulent concealment, the Court will do so with this understanding in mind.

[5] Underlying Defendant's Knowledge Argument, Defendant interjects a procedural argument, emphasizing the heightened pleading standard imposed by Fed. R. Civ. P. 9(b) and asserting that Plaintiffs have failed to plead with the particularity required.

[6] Notably, the only arguments Defendant makes in support of the assertion that the fraudulent concealment claims should be dismissed are Defendant's Knowledge Argument and Defendant's Duty-to-Disclose Argument. For purposes of this Motion, the Court will assume Plaintiffs have adequately pled any other remaining elements of a fraudulent concealment claim with the requisite specificity required to survive the Motion.

[7] The Court refers to Count III as "the unjust enrichment *claims*" (plural) rather than the "unjust enrichment *claim*" (singular) because although Plaintiffs pled only one count of unjust enrichment, such count is pled on behalf of each Named Plaintiff and the Nationwide Class. Therefore, the Named Plaintiffs and the Nationwide Class have effectively each pled a claim of unjust enrichment. Hereinafter, when referencing the claims of unjust enrichment, the Court will do so with this understanding in mind.

## A. <u>Knowledge of the Gas Fumes Defect</u>

Under the law of each of the relevant states,[8] stating a claim for fraudulent concealment requires sufficiently alleging (among other things) that the defendant knew of a material fact that it intentionally concealed. *See Underwood v. Jack Phelan Dodge, LLC*, No. 1-16-1718, 2017 Ill. App. Unpub. LEXIS 194, at *31 (Ill. App. Ct. Feb. 3, 2017) ("To prove fraudulent concealment, a plaintiff must establish that (1) the defendant concealed a material fact under circumstances that created a duty to speak; (2) the defendant intended to induce a false belief . . . ."); *Est. of Anderson ex rel. Herren v. Iowa Dermatology Clinic, PLC,* 819 N.W.2d 408, 414-15 (Iowa 2012) (fraudulent concealment requires showing "the defendant has made a false representation or has concealed material facts . . . [and] the defendant intended the plaintiff to act upon such representations"); *Dickshott v. Angelocci*, No. 241722, 2004 WL 1366001, at *15 (Mich. Ct. App. June 17, 2004) ("The elements of intentional or fraudulent misrepresentation are: (1) the defendant made a material representation, (2) the representation was false, (3) when making the representation, the defendant knew or should have known it was false . . . .")"); *Marvin Lumber and Cedar Co. v. Sapa Extrusions, Inc.*, 964 F. Supp. 2d 993, 1008 (D. Minn. 2013) ("A fraudulent-concealment claim relies on the deliberate concealment of some material fact."); *Mitschele v. Schultz*, 36 A.D.3d 249, 254-55, 826 N.Y.S.2d 14, 19 (2006) ("The elements of a fraudulent concealment claim—

---

[8] Notably, Plaintiffs claim that this Court has jurisdiction over the state law claims because (according to Plaintiffs, at least) the Court has both (1) diversity jurisdiction (Doc. No. 24 at ¶ 18), and (2) federal question jurisdiction that suffices to predicate supplemental jurisdiction (under 28 U.S.C. § 1367) over the state law claims (*id.* at ¶ 25). In a diversity action, the choice-of-law rules of the forum state apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). Similarly, "[f]ederal courts exercising supplemental jurisdiction must apply the forum state's choice of law rules to select the applicable state substantive law." *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017). Notably, neither party addresses choice of law, but instead simply assumes that the law where each Class Vehicle was purchased applies to each of the Named Plaintiffs' individual fraudulent concealment claims. Therefore, as the parties assume that the law where each Class Vehicle was purchased applies, the Court will do the same without further analysis.

concealment of a material fact which defendant was duty-bound to disclose, scienter, justifiable reliance, and injury.").

Before assessing Defendant's Knowledge Argument—and relatedly the plausibility of Plaintiffs' allegations as to Defendant's knowledge of the Gas Fumes Defect—the Court must determine which pleading standard applies. Put another way, the Court must clarify to what degree of specificity Plaintiffs were required to plead their allegations of Defendant's knowledge of the Gas Fumes Defect. "Federal Rule of Civil Procedure 8 imposes a general pleading standard, whereas Rule 9(b) imposes a heightened 'particularity' standard for fraud claims." *Tapply v. Whirlpool Corp.*, 148 F.4th 407, 415 (6th Cir. 2025) (citing Fed. R. Civ. P. 8, 9(b)). Importantly, although the language of Rule 9(b) requires "a party [to] state with particularity the circumstances constituting fraud or mistake[,]" the rule specifies that "[m]alice, intent, *knowledge*, and other conditions of a person's mind *may be alleged generally*." Fed. R. Civ. P. 9(b) (emphasis added).

Defendant cites *Smith v. Gen. Motors LLC*, 988 F.3d 873, 883 (6th Cir. 2021) for its assertion that Plaintiffs were required to plead *with particularity* that Defendant had knowledge of the Gas Fumes Defect. (Doc. No. 29 at pp.10-11). In *Smith*, the Sixth Circuit applied the heightened pleading standard to a knowledge element in a products-liability case, indicating that the plaintiff was required to "state with particularity factual allegations supporting the assertion that [Defendant] knew about the safety implications of the defect." *Smith*, 988 F.3d at 884. But in the aftermath of *Smith*, the Sixth Circuit has made clear that *Smith* ultimately is not all that it is cracked up to be.

"Although Rule 9(b)'s text permits general allegations regarding knowledge, [the Sixth Circuit in *Smith*] . . . imposed a particularity requirement to the knowledge element." *Tapply*, 148 F.4th at 415 (citing *Smith*, 988 F.3d at 883-84). However, the Sixth Circuit subsequently clarified

that despite *Smith* (which was decided in a particular procedural context) [9] the heightened pleading standard does not apply to knowledge allegations, finding that imposing the particularity requirement to such "would contravene the explicit text of Rule 9(b)." *Id.* at 415-16. Therefore, a plaintiff need not allege a defendant's knowledge with particularity. *Id.* at 416. Notably, "although [P]laintiffs need not allege [Defendant's] knowledge with particularity, they nevertheless must allege sufficient facts to show [Defendant] plausibly knew of the [Gas Fumes] Defect." *Id.* Nonetheless, "[e]specially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

In the present case, Defendant asserts that Plaintiffs' First Amended Complaint "[f]ails [t]o [a]llege [Defendant] [k]new [a]bout [t]he [p]urported [d]efect [b]efore Plaintiffs [p]urchased [t]heir [Class Vehicles]." (Doc. No. 29 at 11). Plaintiffs make several factual allegations in support of the notion that Defendant had knowledge of the Gas Fumes Defect at the time Defendant sold

---

[9] Although *Smith* seemingly indicates that the heightened pleading standard would apply to allegations of a person's knowledge, the Sixth Circuit has since clarified that "*Smith* does not raise the pleading standard for knowledge in product defect claims," as "Rule 9(b) specifically excludes 'knowledge' from heightened pleading requirements for fraud." *Tapply*. 148 F.4th at 415.

In *Tapply*, while not stating that that it overruled *Smith*, the Sixth Circuit *distinguished Smith* by stating that "*Smith* was a unique vehicle defect case involving *invited error*." *Id.* (emphasis added). More specifically, in *Smith* the parties together asked for application of *Mross v. Gen. Motors Co., LLC*, No. 15-C-0435, 2016 U.S. Dist. LEXIS 114929 (E.D. Wisc. Aug. 25, 2016). *Smith*, 988 F.3d at 880. The Sixth Circuit in *Smith* found that under the (party-requested) standard imposed by *Mross*, the plaintiff was required "to 'state with particularity' factual allegations supporting the assertion that [the defendants] knew about the safety implications of the . . . defect." *Smith*, 988 F.3d at 884. The plaintiffs in *Smith* tried to assert that the lower court's application of Rule 9(b)'s heightened pleading standard was improper, but the court found that the doctrine of invited error precluded such argument "[b]ecause [the p]laintiffs (and [the d]efendant[]) asked the district court to apply *Mross*." *Id.* at 879 ("[b]ecause [the p]laintiffs (and [the d]efendant[]) asked the district court to apply *Mross*, the doctrine of invited error prevents Plaintiffs from now complaining that the district court did so.").

In sum, although *Smith* fostered confusion regarding whether Rule 9(b)'s heightened pleading standard applies to allegations of knowledge in a fraud claim, the Sixth Circuit has undoubtedly clarified that it is improper to apply the heightened pleading standard for knowledge allegations.

the Class Vehicles: (1) because the Gas Fumes Defect can and does manifest almost immediately—often within weeks of the Class Vehicles first being driven—Defendant presumably received complaints within mere weeks after Defendant began selling the Class Vehicles (i.e., within weeks of October 2021) (Doc. No. 24 at ¶¶ 87 and 99-100); (2) pre-release testing would have revealed the Gas Fumes Defect (*id.* a ¶¶ 97-98 ("[D]uring the pre-release analysis stage of the Class Vehicles, [Defendant] would have known that the Class Vehicles' brand new VC-Turbo engines were defective, and would pose a hazard to owners/lessees, and the motoring public.")); and (3) that the timing of the issuance of the Nissan Talk Tip (January 2023) makes it reasonable to infer that Defendant "had knowledge of the Gas Fumes Defect in the Class Vehicles prior to selling the Class Vehicles to Plaintiffs" (*id.* at ¶¶ 103).

Naturally, in assessing whether Plaintiffs plausibly pled that Defendant had knowledge of the Gas Fumes Defect at the time Defendant sold the Class Vehicles, it matters when Defendant sold the Class Vehicles to each of the Plaintiffs. The first Class Vehicle to be purchased by a named plaintiff was purchased by Plaintiff Headley on July 2, 2022 (*id.* at ¶ 77) and the last Class Vehicle was purchased by Ms. Hall on February 11, 2023 (*id.* at ¶ 57).[10] So, for all of the fraudulent concealment claims to survive the Motion, Plaintiffs' First Amended Complaint must have alleged factual matter plausibly suggesting Defendant knew of the Gas Fumes Defect at the time Plaintiff Headley purchased his car on July 2, 2022 ("July 2 Sale")—the earliest sale of the six Named

---

[10] Below are the dates each Class Vehicle was purchased:

- Plaintiff Headley: July 2, 2022 (Doc. No. 24 at ¶ 77);
- Plaintiff Lawson: October 22, 2022 (*id.* at ¶ 67);
- Plaintiff James Gallina and Plaintiff Julie Gallina: November 26, 2022 (*id.* at ¶ 43);
- Plaintiff Elias: December 3, 2022 (*id.* at ¶ 21);
- Plaintiff Wemer: December 16, 2022 (*id.*at ¶ 32); and
- Plaintiff Hall: February 11, 2023 (*id.* at ¶ 57).

Plaintiffs.[11] The Court finds that it can reasonably infer that Defendant had knowledge of the Gas Fumes Defect at the time of the July 2 Sale and for each sale thereafter ("Pre-Sale Knowledge") based on the facts alleged in Plaintiffs' First Amended Complaint. The Court will analyze each factual allegation in turn.

Most persuasively—and from which the Court predominantly draws its inference of Pre-Sale Knowledge—is Plaintiffs' allegation that Defendant necessarily would have received complaints within mere weeks after Defendant began selling the Class Vehicles in October of 2021 because the Gas Fumes Defect can and does manifest almost immediately, often within weeks of the Class Vehicles first being driven (*id.* at ¶¶ 87 and 99-100), and because the Gas Fumes Defect is widespread among the Class Vehicles (*id.* at ¶ 112).

Importantly, the Court acknowledges that Plaintiffs do not currently claim to have direct evidence of or access to any complaints related to the Gas Fumes Defect *that were made directly to Defendant*.[12] As Plaintiffs explained, "[t]he full universe of complaints made directly to [Defendant] about the Gas Fumes Defect is information presently in the exclusive custody and control of [Defendant], and is not yet available to Plaintiffs prior to discovery." (Doc. No. 24 at ¶

---

[11] Notably, because the Class Vehicles were purchased by Plaintiffs on different dates, and because pre-sale knowledge of the Gas Fumes Defect is required for fraudulent concealment claims, it is possible the First Amended Complaint alleges factual matter plausibly suggesting some of Plaintiffs' fraudulent concealment claims, but not others. Put another way, it is possible that the First Amended Complaint alleges factual matter plausibly suggesting Defendant had knowledge of the Gas Fumes Defect at the time of selling some of the Plaintiffs their cars, but not others. However, and as explained below, because the Court finds it can reasonably infer knowledge of the Gas Fumes Defect at the time of the July 2 Sale (i.e., the earliest of the six sales), Plaintiffs have plausibly pled Defendant had knowledge of the Gas Fumes Defect at the time of each of the six sales to the Named Plaintiffs.

[12] Plaintiffs do have access to publicized complaints. For example, in Plaintiffs' First Amended Complaint, Plaintiffs provide examples of complaints made on a "Nissan Rogue enthusiast website," (Doc. No. 24 at ¶¶ 105-109), on Facebook (*id.* at ¶ 110), and to the NHTSA (*id.* at ¶ 112). Although a majority of the aforementioned complaints occurred after the Plaintiffs purchased the Class Vehicles, Plaintiffs alleged that Defendant inevitably received direct complaints of the Gas Fumes Defect prior to Plaintiffs' purchase of the Class Vehicles—complaints which Plaintiffs have no means of accessing prior to discovery.

99). However, at the present (motion-to-dismiss) phase, Plaintiffs are not required to provide such evidence; rather, it is sufficient for Plaintiffs to plead facts that would plausibly suggest such pre-sale complaints exist—something the Court concludes Plaintiffs have done. Although the Court would find it improper to infer the existence of such pre-sale complaints merely from Plaintiffs' assertion that they exist, the Court finds the inference permissible in light of the other factual allegations made.

More specifically, Plaintiffs alleged that Defendant began selling the Class Vehicles in October of 2021—more than eight months before the July 2 Sale. (Doc. No. 24 at ¶¶ 77 and 87). The Plaintiffs alleged that "the Gas Fumes Defect can and does manifest almost immediately – often within weeks of the Class Vehicle first being driven." (*Id.* at ¶ 100). The Plaintiffs' themselves alleged how quickly they observed the Gas Fumes Defect, ranging from observing "shortly after" or "within the first few weeks" of purchasing the Class Vehicle to—at most—two months after purchase. (*Id.* at ¶¶ 26 ("Shortly after Mr. Elias purchased his vehicle, he observed [the Gas Fumes Defect]"); 37 ("A little over a month after Ms. Wemer purchased her vehicle, she observed [the Gas Fumes Defect]"); 48 ("A little over a month after the Gallinas purchased their vehicle, they observed [the Gas Fumes Defect]"); 62 ("Within weeks after Ms. Hall purchased her vehicle, she observed [the Gas Fumes Defect]"); 72 ("Within the first few weeks after Mr. Lawson purchased his vehicle, he observed [the Gas Fumes Defect]"); and 82 ("Two months after Mr. Headley purchased his vehicle, he observed [the Gas Fumes Defect]")).

In addition to alleging factual matter tending to suggest how quickly the Gas Fumes Defect manifests after buying and using the Class Vehicles, Plaintiffs further alleged factual matter tending to establish how widespread the issue is among Class Vehicles. (*Id.* at ¶ 112). In relying on the countless customer complaints presently accessible by Plaintiffs, Plaintiffs alleged that the

Gas Fumes Defect is "widespread." (*Id.*). *Plaintiffs* alleged that multiple Class Vehicle Owners wrote about the Gas Fumes Defect on a "Nissan Rogue enthusiast website" (Doc. No. 24 at ¶¶ 105-109), "dozens of Class Vehicle owners voiced on Facebook their frustration with receiving no repair" for the Gas Fumes Defect (*id.* at ¶ 110), and Plaintiffs provided 72 examples of complaints filed by consumers with the NHTSA regarding the Gas Fumes Defect (*id.* at ¶ 112).

In sum, "constru[ing] the complaint in the light most favorable to the plaintiff," *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012), and keeping in mind that at the present (motion-to-dismiss) phase the Court must draw all reasonable inferences in favor of Plaintiffs, the Court finds that Plaintiffs' factual allegations tend to suggest that the Gas Fumes Defect was widespread among the Class Vehicles and would manifest within weeks after buying and using the Class Vehicles. Therefore, the Court finds that it is reasonable to infer that Defendant would have started to receive complaints about the Gas Fumes Defect within a few weeks of beginning to sell the Class Vehicles. Put another way, it is reasonably inferable that Defendant received complaints pertaining to the Gas Fumes Defect within a few weeks after October 2021, and correspondingly that Defendant learned of the Gas Fumes Defect at such time. Thus, considering that the first Class Vehicle purchased by one of the Plaintiffs in this case was on July 2, 2022 (i.e., the July 2 Sale)—over eight months after Defendant began selling the Class Vehicles in October of 2021—it is reasonable for the Court to infer that Defendant had already received complaints about the Gas Fumes Defect (and therefore had knowledge of the Gas Fumes Defect) at the time of the July 2 Sale. So, the Court can reasonably infer that Defendant had Pre-Sale Knowledge.

Additionally, the Court finds it can reasonably infer Pre-Sale Knowledge based on Plaintiffs' allegation that the Gas Fumes Defect necessarily would have been revealed during pre-

release testing of the Class Vehicles. (Doc. No. 24 at ¶¶ 97-98). More specifically, Plaintiffs alleged the following:

> [D]uring the pre-release process of designing, manufacturing, engineering, and performing durability testing on the Class Vehicles' VC-Turbo engines, which would have occurred in 2021 before Nissan began selling the Class Vehicles in Fall 2021, Nissan necessarily would have gained comprehensive and exclusive knowledge that the Class Vehicles' engines cause the Class Vehicles to emit gasoline fumes. Thus, during the pre-release analysis stage of the Class Vehicles, Nissan would have known that the Class Vehicles' brand new VC-Turbo engines were defective, and would pose a hazard to owners/lessees, and the motoring public.

(*Id.* at ¶ 98). Defendant cites *Smith* in support of its assertion that Plaintiffs' reliance on pre-release testing in an effort to establish Pre-Sale Knowledge is improper. (Doc. No. 36 at 2). However, *Smith* is distinguishable from the case at bar for multiple reasons. First, the district court in *Smith* applied the heightened pleading standard of Fed. R. Civ. P. 9(b) when analyzing whether the plaintiff sufficiently pled that the defendant had knowledge. *Smith*, 988 F.3d at 884. Importantly, and as discussed above, the Court will not apply the heightened pleading standard in the present case when assessing whether Plaintiffs plausibly pled that Defendant had knowledge of the Gas Fumes Defect. Furthermore, the defect involved in *Smith* is materially distinguishable from the Gas Fumes Defect at issue in the present case. In *Smith*, the defect would not appear "until after driving the[] car tens (or hundreds) of thousands of miles over many years." *Smith*, 988 F.3d at 886. And because the defect took so long to manifest itself, the district court in *Smith* found that it was not plausible to infer knowledge from pre-release testing. In contrast, and as explained above, Plaintiffs alleged that "the Gas Fumes Defect can and does manifest almost immediately – often within weeks of the Class Vehicles first being driven." (Doc. No. 24 at ¶ 100). Therefore, unlike in *Smith*, the Court finds that it can infer knowledge of the Gas Fumes Defect from pre-release testing based on how quickly the Gas Fumes Defect manifests.

Plaintiffs cite persuasive authority tending to establish that plaintiffs can rely on pre-release testing to establish knowledge of a defect. *See e.g., Rains v. Jaguar Land Rover North America, LLC*, No. 22cv4370 (EP) (JSA), 2023 WL 6234411, at \*6 (D.N.J. Sept. 26, 2023). In *Rains*, the court concluded that alleged pre-release testing was relevant in the determination of whether the plaintiff plausibly pled that the defendant had pre-release knowledge because:

> [t]he [first amended complaint] makes specific allegations of what knowledge [the defendant] would have gained about the Vehicles' windshields through pre-release testing. Further, given the importance of a vehicle's windshield, which allows the driver to see the road and plays a vital role during collisions, it is plausible that [the defendant] would test the durability of a windshield.

*Id.* (Internal citations omitted). The Court finds such reasoning persuasive. Importantly, here Plaintiffs do not conclusively state that pre-release testing necessarily would have revealed the Gas Fumes Defect, but instead make specific allegations of what knowledge Defendant would have gained from pre-release testing—namely, that "the Class Vehicles' engines cause the Class Vehicles to emit gasoline fumes." (Doc. No. 24 at ¶ 98). Furthermore, Plaintiffs alleged that the kind of engine in question (VC-Turbo) was brand new and that therefore Defendant must have been "tracking the performance of its VC-Turbo engines particularly closely." (*Id.* at ¶ 101). It is plausible that Defendant would have tested this new engine—likely extensively—prior to releasing (placing on the market) the Class Vehicles.

In sum, the Court finds that it is reasonable to infer that Defendant would have conducted pre-release testing prior to releasing the new Class Vehicles, through which Defendant would have learned of the Gas Fumes Defect in light of how quickly that defect manifests itself and how widespread the defect appears to be.

In further support of their assertion that Defendant had Pre-Sale Knowledge, Plaintiffs point to the Nissan Talk Tip. Defendant attacks any reliance on the Nissan Talk Tip, arguing that Nissan Talk Tip instead establishes that Defendant did not have knowledge of the Gas Fumes

Defect at the time Defendant issued the Nissan Talk Tip. More specifically, Defendant asserts that the Nissan Talk Tip shows that when it was issued, Defendant "knew at most some vehicles were encountering a gasoline odor, and it was investigating the cause of the issue." (Doc. No. 29 at 12; Doc. No. 36 at 1-2 (Defendant "knew at most that '[on] *some* MY2022 and newer Nissan Rogue vehicles equipped with a 3-cylinder engine, an odor of gasoline may be noticed' and the cause was under investigation.")). Ultimately, Defendant's argument appears to be that because Defendant did not know the *cause* of the Gas Fumes Defect and because the Nissan Talk Tip said "some" Class Vehicles may suffer from the Gas Fumes Defect, that it cannot be said to have had knowledge of the Gas Fumes Defect. The Court finds such argument to be unavailing and unsupported. Importantly, Defendant bears the burden of explanation as to why Plaintiffs' claims fail. *Total Benefits Planning Agency, Inc.,* 552 F.3d at 434 ("The moving party has the burden of proving that no claim exists."). Defendant has failed to cite to any authority in support of its assertion that one must know the cause of a defect to be deemed to have knowledge of the defect's *existence*. Similarly, Defendant fails to cite to authority establishing that a Defendant must know the exact scope of the defect in question to be deemed to have knowledge of the defect's *existence*. Considering such assertions go wholly unsupported, the Court does not find that the Nissan Talk Tip establishes an absence of knowledge.[13]

Instead, the Court finds that it can reasonably infer, from Defendant's issuance of the Nissan Talk Tip, that Defendant had knowledge of the existence of the Gas Fumes Defect at the time of such issuance. The Nissan Talk Tip was issued to provide assistance in diagnosing specific

---

[13] Notably, in order to accept Defendant's argument that the Nissan Talk Tip establishes that Defendant did not have Pre-Sale Knowledge, the Court would need to draw inferences *against* Plaintiff, but in ruling on the Motion, all inferences must instead be drawn in *favor* of Plaintiffs. *Cf Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) ("In reviewing a motion to dismiss, we . . . draw all reasonable inferences in favor of the plaintiff.").

"customer concerns"—those being the "Fuel Odor" issue. (Doc. No. 29-1). The Nissan Talk Tip states things like "[f]or customers who are not willing to drive their vehicles while investigation of this *issue* is undertaken" and that it "is currently investigating this *issue* where there are no problems found." (*Id.* (emphasis added)). The Court finds that the Nissan Talk Tip itself reflects Defendant's admission that there was a gas odor "issue" (i.e., a defect), and the Court can infer— from the fact that Defendant found it necessary to issue a Talk Tip providing instruction regarding how to handle reporting of such issue—that the issue in question was pervasive. Therefore, drawing all reasonable inferences in Plaintiffs' favor—as is necessary at the motion-to-dismiss phase—the Court finds that the Nissan Talk Tip supports the inference that Defendant had knowledge of the Gas Fumes Defect at the time it was issued.

Plaintiffs assert not only that Defendant had knowledge of the Gas Fumes Defect at the time the Nissan Talk Tip was issued in January of 2023, but also that Defendant necessarily must have had knowledge of such defect prior to issuance of the Nissan Talk Tip. (Doc. No. 24 at ¶ 102-03). More specifically, Plaintiffs alleged that "[g]iven the time it takes . . . to gather relevant data, compile relevant consumer complain[t]s and investigate such fuel odor complain[t]s, and then prepare and release [the Nissan Talk Tip,]" the Nissan Talk Tip itself "establishes [Defendant] had knowledge of the Gas Fumes Defect in the Class Vehicles prior to selling the Class Vehicles to Plaintiffs." (*Id.* at ¶ 103).

In support of this assertion, Plaintiffs cite to persuasive authority suggesting that "'[i]t is reasonable to infer' that automakers have knowledge of potential defects before they issue technical service bulletins because 'presumably, the [bulletins are] proceeded [sic] by an accretion of knowledge.'"[14] *In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp.

---

[14] In the quoted text, the word used is "proceeded." In context, it is clear that this was a scrivener's error and that the word intended was "preceded."

3d 618, 637 n. 15 (E.D. Mich. 2019) (citing *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014)). Notably, "[a] TSB [technical service bulletin] is an 'alert that informs authorized service technicians to pervasive issues affecting particular models and model years.'" *Hall v. GM, LLC*, No. 19-cv-10186, 2020 U.S. Dist. LEXIS 46595, at *12-13 (E.D. Mich. Mar. 18, 2020) (quoting *In re General Motors Air Conditioning Marketing and Sales Practices Litig.*, 406 F. Supp. 3d. at 636-37 (internal quotation marks omitted)). Defendant argues that the Nissan Talk Tip is not a TSB and should not be treated as one (Doc. No. 36 at 2 n.2); however, the Nissan Talk Tip would appear to fall within the aforementioned definition as the Nissan Talk Tip was issued to service technicians and informed them of the specific issue (i.e., Gas Fumes Defect) affecting a particular model of car. (Doc. No. 29 at 3; Doc. 29-1 ("[o]n some MY2022 and newer Nissan Rogue vehicles equipped with 3-cylinder engine, an odor of gasoline may be noticed in and/or around the vehicle")). Furthermore, Plaintiffs themselves refer to the Nissan Talk Tip as a "bulletin." (Doc. No. 24 at ¶ 103).

Defendant provides neither any authority supporting its conclusory assertion that there is a material distinction between a TSB and the Nissan Talk Tip nor any argument supporting why such a distinction should be made. The Court itself finds that the only articulable distinction appears to be that TSBs tend to provide a solution for an issue, whereas the Nissan Talk Tip acknowledges that it has not yet found a solution for the issue (the "Distinction"). *See e.g., Fisher v. FCA US LLC*, 712 F. Supp. 3d 930, 944 (E.D. Mich. 2024) (providing examples of TSBs that provide both a warning of an issue and a possible solution thereto); *Miller v. GM,* LLC, 773 F. Supp. 3d 461, 499 (E.D. Mich. 2025) (same); *Bolton v. Ford Motor Co.*, No. 23-00632-GBW, 2024 U.S. Dist. LEXIS 118935, at *32 (D. Del. July 8, 2024) (same). The Court finds that despite the Distinction, the rationale for finding it reasonable to infer that an automaker had knowledge of defects before

it issues a TSB is likewise applicable to Defendant's issuance of the Nissan Talk Tip.[15] Put another way, the Court finds it reasonable to infer that Defendant had knowledge of the Gas Fumes Defect at some time prior to issuance of the Nissan Talk Tip.

The Nissan Talk Tip provides information and guidance to be used when "diagnosing some customer concerns." (Doc. No. 29-1). The "customer concern" discussed in the Nissan Talk Tip is the "Fuel Odor" issue (i.e., the Gas Fumes Defect). (*Id.*). The Court finds that just as with a TSB it is reasonable to infer that Defendant would have to have obtained some degree of knowledge about the Gas Fumes Defect prior to issuing the Nissan Talk Tip. Therefore, the Court finds that it can reasonably infer Defendant had knowledge of the Gas Fumes Defect prior to it issuing the Nissan Talk Tip, but how long prior is a question of consequence.

Each of the six named Plaintiffs purchased their Class Vehicles at a different time from the time of purchase of the other five named Plaintiffs. One purchase was in July of 2022, one in October of 2022, one in November of 2022, two in December of 2022, and one in February of 2023. (Doc. No. 24 at ¶¶ 21, 32, 43, 57, 67, and 77.). Whether the Nissan Talk Tip provides further support of Pre-Sale Knowledge depends on how far before the issuance of the Nissan Talk Tip the inference of knowledge can extend. There is no doubt that the Nissan Talk Tip provides support for the assertion that Defendant had knowledge at the time of the February 2023 sale as the Nissan Talk Tip had already been issued at that point. However, the remaining five purchases all occurred before the issuance of the Nissan Talk Tip.

Neither side cites support for how far prior—if at all—to the issuance of the Nissan Talk Tip in January 2023—the inference of knowledge should go. Although there does not appear to be caselaw that directly would answer that question, other courts have—as discussed above—

---

[15] Importantly, and as the Court will discuss hereafter, the Distinction may ultimately justify a difference between how long before issuance a court can infer knowledge of the defect in question.

answered a somewhat related question: how long before issuance of a TSB a court can infer knowledge. Importantly, courts have found it reasonable to infer knowledge of a defect prior to the issuance of a TSB because prior to issuance there likely must have been months of research and investigation. *See In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d at 637 n.15 ("'[i]t is reasonable to infer' that automakers have knowledge of potential defects before they issue technical service bulletins because 'presumably, the [bulletins are] proceeded by an accretion of knowledge.'" (citing *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d at 958)); *Bolton*, 2024 U.S. Dist. LEXIS 118935, at *31-32 ("Given the high probability that the TSB followed months of research and investigation by Ford, the Court finds that Plaintiffs can rely on the post-sale TSBs as evidence of Ford's pre-sale knowledge of the Defect."). Courts around the country have varied in how far back they believe such inference can extend; some have allowed the inference of knowledge to extend over a year prior to the issuance of a TSB while others found that six months prior was excessive.[16]

In the present case, the earliest purchase—the July 2 Sale—was roughly six months prior to the issuance of the Nissan Talk Tip. (Doc. No. 24 at ¶ 77). The other sales that occurred prior to the issuance of the Nissan Talk Tip ranged from one month prior to three months prior. (*Id.* at ¶¶

---

[16] *See e.g., Fisher*, 712 F. Supp. 3d at 944 n.3 (finding that the plaintiff could not rely on the TSBs "to support an inference of pre-sale knowledge," stating that a purchase *seven months* before the issuance of the TSB was "too long." (emphasis added)); *Miller*, 773 F. Supp. 3d at 499 n.4 ("While it is 'common sense' to infer that [the defendant] had knowledge of the issue before it published the TSB, it is not reasonable to infer that [the defendant] had knowledge of the issue *six months* before." (emphasis added)); *Dixon v. Ford Motor Co.*, No. 14-CV-6135 (JMA) (ARL), 2015 U.S. Dist. LEXIS 146263, at *24 (E.D.N.Y. Sept. 20, 2015) (finding that "it is plausible that defendant knew of the defect *two months* prior to the TSB's release." (emphasis added)); *Bolton*, 2024 U.S. Dist. LEXIS 118935, at *31-32 (holding that a June 2019 TSB supported allegations of knowledge in September 2018—roughly *nine months* prior); *and Browning v. Am. Honda Motor Co.*, No. 20-CV-05417-BLF, 2022 U.S. Dist. LEXIS 183512, at *9 (N.D. Cal. Oct. 6, 2022) (holding that a December 2019 TSB supported allegations of knowledge in July 2018—*one year and five months* prior).

21, 32, 43, and 67).[17] As discussed above, the Nissan Talk Tip appears to be quite comparable to a TSB, with only the Distinction to distinguish them from one another. The Court recognizes that the Distinction—which, as noted, is that a TSB (unlike the Nissan Talk Tip) is not issued until there has been the investigation of an issue *and* the discovery/development of a fix for the issue— tends to support extending the inference further backwards in time in the case of a TSB than in the case of the Nissan Talk Tip; presumably, it would have taken less time to investigate the Gas Fumes Defect prior to issuing the Nissan Talk Tip than it would take to issue a TSB (which as noted would require not only an investigation of, but also the development of a fix for, the problem).

Keeping in mind the Distinction, while also considering the similarities and the relevant case law, the Court finds that it would be reasonable for the Court to infer Defendant had knowledge of the Gas Fumes Defect a few months prior to the issuance of the Nissan Talk Tip, which surely would have taken some time to prepare for issuance. Notably, this period is shorter than even the comparatively short periods (six or seven months, but not necessarily periods shorter than that) adopted by some courts in the case of TSBs. *See Fisher*, 712 F. Supp. 3d at 944 n.3 (finding that *seven months* was too long); *Miller*, 773 F. Supp. 3d at 499 n.4 (finding that *six months* before was too long); *Dixon*, 2015 U.S. Dist. LEXIS 146263, at *24 (finding that *two months* was *not* too long). It follows from this conclusion that the Nissan Talk Tip was issued too late for it to support an inference of knowledge on Defendant's part at the time of the July 2 Sale. But the Court finds it reasonable to infer knowledge of the Gas Fumes Defect at the times of the other sales (i.e., the sales that occurred one to three months before the Nissan Talk Tip was issued) from the Nissan Talk Tip.

---

[17] Notably, Plaintiff Hall's purchase occurred *after* the issuance of the Nissan Talk Tip. (Doc. No. 24 at ¶ 57).

In sum, the Court finds it can reasonably rely on the Nissan Talk Tip as *further* support for the assertion that Defendant had Pre-Sale Knowledge at the time of each sale other than the July 2 Sale. But even without this further support, Pre-Sale Knowledge at the time of the July 2 Sale can reasonably be inferred from Plaintiffs' other factual allegations.

Underlying the Court's ultimate conclusion is the reality that the facts that would tend to establish when Defendant had knowledge of the Gas Fumes Defect would be in the exclusive possession and control of Defendant. In line with the Sixth Circuit precedent discussed above, this reality makes the Court reluctant to dismiss the action prior to discovery. *Williams*, 681 F.3d at 803 ("Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control." (quoting *Michaels Bldg. Co.*, 848 F.2d at 680)). Although the "doors of discovery" shall not be unlocked "for a plaintiff armed with nothing more than conclusions," *Iqbal*, 556 U.S. at 678, the Court finds that Plaintiffs have armed themselves with more than conclusory statements, alleging facts from which the Court can reasonably infer Defendant had Pre-Sale Knowledge. Therefore, the Court finds that Plaintiffs' factual allegations in the aggregate plausibly suggest the existence of Defendant's Pre-Sale Knowledge of the Gas Fumes Defect.[18] The Court therefore concludes that Defendant's Knowledge Argument does not support dismissal of Plaintiffs' fraudulent concealment claims or the Fraud-Based Claims as a whole.

---

[18] It goes almost without saying that this suggestion could be put to the test at later stages of litigation. Discovery can, and likely will, shed light on the extent to which the evidence shows (or fails to show) that Defendant had Pre-Sale Knowledge of the Gas Fumes Defect.

### B. Duty to Disclose the Gas-Fumes Defect[19]

The Court turns next to Defendant's alternative argument, which is that Plaintiffs' claims for fraudulent concealment—and correspondingly the Fraud-Based Claims as a whole—should be dismissed because (according to Defendant) Defendant did not have a duty to disclose the Gas Fumes Defect. (Doc. No. 29 at 13). As discussed above, in federal court, allegations of fraud must be pled with particularity pursuant to Rule 9(b). *See* Fed. R. Civ. P. 9(b). Under this standard, plaintiffs alleging fraudulent concealment must specify "'the who, what, when, where, and how' of the alleged omission." *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012) (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006)). More specifically, plaintiffs must allege: "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [Defendant] obtained as a consequence of the alleged fraud." *Id.* at 256.

Defendant appears to argue not that Plaintiffs failed to specifically allege what the alleged omission was, but instead that the omission—namely, the non-disclosure of the Gas Fumes Defect—was not fraudulent, because (again, according to Defendant) Defendant was under no duty to disclose the Gas Fumes Defect. State law governs whether Defendant had a duty to disclose the Gas Fumes Defect to each Named Plaintiff. So, the Court will separately address whether Defendant had a duty to disclose the Gas Fumes Defect to each Named Plaintiff, considering the particular state law applicable to the respective Named Plaintiffs.

---

[19] Importantly, Plaintiffs brought their fraudulent concealment claims (Count II) on behalf not only of themselves, but also a nationwide class. (Doc. No. 24 at p. 49). Defendant's Motion does not directly address this. Therefore, the Court will deny the Motion to the extent it seeks dismissal of the Nationwide Class's fraudulent concealment claim separate and apart from dismissal of the Named Plaintiffs' fraudulent concealment claims. That is not to say that class certification necessarily will prove appropriate in this case.

1. *Duty to disclose under Illinois law (Plaintiffs Wemer and the Gallinas)*

Under Illinois law, a duty to disclose may arise in several situations. *See Lessin v. Ford Motor Co.*, No. 3:19-CV-01082-AJB-AHG, 2021 WL 3810584, at *12 (S.D. Cal. Aug. 25, 2021) (interpreting Illinois law). One is where plaintiff and defendant are in a "fiduciary or confidential relationship." *Kurti v. Fox Valley Radiologists, Ltd.*, 464 N.E.2d 1219, 1223 (Ill. App. Ct. 1984). Another is "where trust and confidence, by reason of friendship, agency and experience, are reposed by one person in another so the latter gains influence and superiority over the former." *Kurti*, 464 N.E.2d at 1223. And as is most specifically applicable in the instant case, "a manufacturer of cars . . . owe[s] a duty to consumers under Illinois law to disclose 'safety defects.'" *Lessin*, 2021 WL 3810584, at *12 (interpreting Illinois law). *Accord In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 414 (S.D.N.Y. 2017) (finding that courts have held that "a manufacturer of cars (or car parts) owed a duty to consumers under Illinois law to disclose 'safety defects.'"); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-CV-2765 (JLL), 2017 WL 1902160, at *20 (D.N.J. May 8, 2017) ("Plaintiffs here have specifically pled that the defect in the Timing Chain System created safety concerns, and, despite [d]efendant's knowledge of the defect and the safety concerns associated with the same, [d]efendant chose not to disclose the defect to [p]laintiffs. Hence, [d]efendant had a duty to disclose the defect under . . . Illinois . . . law. . . ." (citation omitted)).

In the Response, Plaintiffs assert that the Gas Fumes Defect is a safety defect, which "provides an independent basis upon which [Defendant] had a duty to disclose." (Doc. No. 34 at 12). Plaintiffs here have specifically alleged that the Gas Fumes Defect created safety concerns, and that despite Defendant's knowledge of the Gas Fumes Defect and the safety concerns, Defendant chose not to disclose the Gas Fumes Defect to Plaintiffs. Plaintiffs specifically alleged that the "engine defect and resulting strong fuel odor throughout the interior of the vehicle makes

Class Vehicle owners physically ill and is a fire safety hazard." (Doc. No. 24 at ¶ 3). Plaintiffs go on to provide examples of complaints of owners of Class Vehicles related to the Gas Fumes Defect, including that their "kids are getting sick and I am afraid my car will cause fire"; the "gas and fumes make me sick and my eyes water at times"; the "fumes are nauseating and cause headaches"; the "[s]mell is so strong it makes you feel light headed and gives you a headache. This is a huge health concern for me and my family"; and they experience "dizziness." (*Id.*).

Importantly, Defendant has the burden of explanation as to why the Court should decline to classify the Gas Fumes Defect as a "safety defect"—a burden the Defendant wholly fails to meet. In the absence of argument from Defendant as to why it would be improper to classify the Gas Fumes Defect as a "safety defect," the Court finds that based on its "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, that the above-referenced factual assertions plausibly suggest—with the required degree of specificity—that the Gas Fumes Defect would qualify as a "safety defect" that would impose a duty to disclose on Defendant.

In sum, the Court finds that Plaintiffs have plausibly suggested that under Illinois law, Defendant did have a duty to disclose the Gas Fumes Defect to the Illinois Plaintiffs, i.e., Plaintiffs Wemer and the Gallinas. Therefore, the Court will deny Defendant's Motion as it relates to Plaintiff Wemer's and the Gallinas' claims for fraudulent concealment (Count II). Relatedly, because Defendant's argument for dismissal of Plaintiff Wemer's and the Gallinas' claims for violation of the Illinois consumer protection statute (Count XIII) was premised on the failure of Plaintiff Wemer's and the Gallinas' fraudulent concealment claims—a premise that has turned out to be flawed—Defendant's request for dismissal of Count XIII fails and will likewise be denied.

Finally, Defendant made the same unavailing argument as grounds for dismissal of Plaintiff Wemer's and the Gallinas' unjust enrichment claims (Count III). But with respect to those claims,

Defendant made an additional reason for dismissal of those claims—namely, that such claims were precluded by the existence of an express warranty. Thus, the Court must first analyze the viability of such alternative argument before deciding whether Defendant's request to dismiss Plaintiff Wemer's and the Gallinas' unjust enrichment claims (Count III) will be granted or denied—a task the Court undertakes below in Section I.C.

### 2. Duty to disclose under Iowa law (Plaintiff Hall)

"Whether a legal duty exists is a matter of law for the court to decide." *Maint. Enters., LLC v. Orascom E&C USA, Inc.*, No. 316CV00014SMRSBJ, 2018 WL 6380778, at *6-7 (S.D. Iowa Jan. 30, 2018) (citing *Union Cnty., Iowa v. Piper Jaffray & Co., Inc.*, 788 F. Supp. 2d 902, 909 (S.D. Iowa 2011)). "Under Iowa law, the failure to disclose material information can constitute fraud if the concealment is made 'by a party under a duty to communicate the concealed fact.'" *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002) (quoting *Cornell v. Wunschel*, 408 N.W.2d 369, 374 (Iowa 1987). Under Iowa law, "a manufacturer's failure to warn or to disclose material information does not give rise to a fraud claim when the relationship between a plaintiff and a defendant is solely that of a customer/buyer and manufacturer[,] with two exceptions. Those exceptions are limited to instances where the *manufacturer* (1) has made misleading statements of fact intended to influence consumers, or (2) has made true statements of fact designed to influence consumers and subsequently acquires information rendering the prior statements untrue or misleading." *Id.* at 177 (emphasis added).

In the present case, Plaintiff Hall has failed to allege any facts that would plausibly suggest Defendant—as the manufacturer—made any misleading statements. At most, Plaintiff Hall conclusively states that "Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and the Gas Fumes Defect." (Doc. No.

24 at ¶¶ 139.d and 232.d). Such conclusory statement need not be accepted as true and fails to provide any factual support for the assertion that Defendant made any misleading statement. Furthermore, in the Response, Plaintiffs reiterate what the Nissan *car dealership* told Plaintiff Hall, but again failed to allege Defendant itself made any misleading statements that would create a duty to disclose. Defendant asserts that because "Plaintiff Hall has not alleged any false statements by [Defendant]," Defendant—as the manufacturer—did not have a duty to disclose under Iowa law. (Doc. No. 29 at 15). The Court agrees.

Therefore, because Plaintiffs did not allege factual matter plausibly suggesting Defendant owed Plaintiff Hall a duty to disclose—a required element of a claim for fraudulent concealment under Iowa law, *see Wright*, 652 N.W.2d at 174—Plaintiff Hall's claim for fraudulent concealment (Count II) will be dismissed. However, although Defendant asserts that the claims for unjust enrichment and violation of the Iowa Private Right of Action for Consumer Frauds Act ("Iowa Act") are "interconnected[] [with] the predicate claim (fraudulent concealment)," arguing that "the Fraud[-Based] Claims rise or fall together" (Doc. No. 29 at 9), the Court does not agree. Instead, the Court finds that the failure of Plaintiff Hall's fraudulent concealment claim does not necessarily doom Defendant Halls's claim for unjust enrichment (Count III) nor violation of the Iowa Act (Count X). To sustain either claim, there is no need to establish the requisites of a claim of fraudulent concealment.

For example, the Iowa Act broadly prohibits persons from engaging in the following types of behavior:

> [A] practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the

> advertisement, sale, or lease of consumer merchandise, or the solicitation of
> contributions for charitable purposes.

Iowa Code § 714H.3. As is made clear by this language, although fraudulent concealment is a type of wrongful conduct that could support a claim for violation of the Iowa Act, it is not the only kind. Notably, the Court finds that although Plaintiffs' allegations do not plausibly suggest that failure to disclose the Gas Fumes Defect amounts to fraudulent concealment, such failure could qualify as another form of wrongful conduct that is prohibited by the Iowa Act. For example the failure to disclose could qualify as an "omission of a material fact" within the meaning of the Iowa Act. Under Iowa law, an omission is material if it is "likely to affect a consumer's conduct or decision with regard to a product or service." *State ex rel. Miller v. Rahmani*, 472 N.W.2d 254, 258 (Iowa 1991). Defendant provides no argument disputing that the Gas Fumes Defect is material (i.e., likely to affect a consumer's conduct or decision) within the meaning of the Iowa Act.

The Court finds that Plaintiffs have alleged factual matter plausibly suggesting, with the required degree of specificity, that the Gas Fumes Defect is a material defect that Defendant did not disclose. For example, in the First Amended Complaint, Plaintiffs generally alleged that "[t]he facts concealed or not disclosed by Defendant to Plaintiff Hall and Iowa Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles." (Doc. No. 24 at ¶ 233). More specifically, Plaintiffs alleged that "[Defendant's] omissions were material to Ms. Hall. If [Defendant] had adequately disclosed these facts before Ms. Hall purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it had she known the vehicle suffered from the Gas Fumes Defect." (*Id.* at ¶ 61). Plaintiffs here rely respectively on a conclusory assertion and a somewhat thin factual assertion (that Ms. Hall subjectively and actually would have refused to buy the vehicle at the price for which she did buy

it). The Court finds that it can reasonably infer, albeit just barely, that the Gas Fumes Defect was material within the meaning of the Iowa Act based on that limited factual assertion and the reality that the conclusory assertion (though, of course, conclusory) seems objectively reasonable enough when its merits are considered.

In sum, the Court finds that the failure of Plaintiff Hall's claim of fraudulent concealment does not oblige the Court to dismiss Plaintiff Hall's claim for violation of the Iowa Act (Count X). When requesting dismissal of Plaintiff Hall's claim for violation of the Iowa Act, Defendant could have provided an argument for why its conduct would not qualify as an "omission of a material fact" or some other wrongful conduct prohibited by the Iowa Act. But Defendant failed to do so. Importantly, and as discussed above, Defendant bears the burden of explanation as to why Plaintiff Hall's claim for violation of the Iowa Act fails. Because the Iowa Act prohibits numerous types of wrongful conduct, Defendant's assertion that failure of Plaintiff Hall's claim for fraudulent concealment necessitates failure of her claim for violation of the Iowa Act is unavailing. Therefore, because Defendant proffers no additional reason for dismissal of Plaintiff Hall's claim for violation of the Iowa Act, the Court declines to dismiss such.

Similarly, Plaintiff Hall's claim for unjust enrichment is likewise not dependent on the success of her claim for fraudulent concealment. Under Iowa law, "unjust enrichment is a broad principle with few limitations." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 155 (Iowa 2001). To successfully assert a claim for unjust enrichment "it is essential merely to prove that a defendant has received money which in equity and good conscience belongs to plaintiff." *Midwest Media Group, Inc. v. Fusion Entm't, Inc.*, No. 12-0189, 2012 WL 5541613, at *4 (Iowa Ct. App. Nov. 15, 2012) (quoting *In re Estate of Stratman*, 1 N.W.2d 636, 642 (Iowa 1942)). Although Plaintiff Hall could have supported a claim of unjust enrichment had she made factual allegations

sufficient to support a claim of fraudulent concealment under Iowa law, 'such is not the only path to show Defendant was unjustly enriched. Instead, the test is whether Defendant "received money which in equity and good conscience belongs to plaintiff." *Id.* Defendant's actions need not qualify as fraudulent concealment to satisfy this standard. Notably, and as discussed above, the Court found that Plaintiffs plausibly pled Defendant's conduct was violative of the Iowa Act through alleging that failure to disclose the Gas Fumes Defect would qualify as a material omission; such wrongful conduct would support a claim of unjust enrichment under Iowa law, given the breadth of the applicable standard.

In sum, failure of Plaintiff Hall's fraudulent concealment claim does not necessitate failure of her unjust enrichment claim, nor her claim for violation of the Iowa Act. Therefore, the Court declines to dismiss Plaintiff Hall's claim for violation of the Iowa Act (Count X). However, although Plaintiff Hall's fraudulent concealment claim does not necessitate failure of her unjust enrichment claim (Count III), Defendant proffered an additional reason for dismissal—that being that a claim of unjust enrichment is precluded by the existence of an express warranty. So, the Court must first analyze the viability of that alternative reason before deciding whether to grant Defendant's request to dismiss Plaintiff Hall's unjust enrichment claim (Count III)—a task that the Court undertakes below in Section I.C.

### 3. *Duty to disclose under Michigan law (Plaintiff Elias)*

Under Michigan law, the state's equivalent of fraudulent concealment is "silent fraud." *Cf M&D, Inc. v. McConkey,* 585 N.W.2d 33, 37 (Mich. Ct. App. 1998) ("'Silent fraud,' also known as fraud by nondisclosure or fraudulent concealment, is a commonly asserted, but frequently misunderstood, doctrine."). To demonstrate "silent fraud," "mere nondisclosure is insufficient" because "[t]here must be circumstances that establish a legal duty to make disclosure." *Hord v. Env't Rsch. Inst. of Michigan,* 617 N.W.2d 543, 550 (Mich. 2000). *Accord M&D Inc.*, 585 N.W.2d

at 37 ("Michigan courts have recognized that silence cannot constitute actionable fraud *unless* it occurred under circumstances where there was a legal duty of disclosure."); *Compuware Corp. v. Moody's Invs. Servs.*, Inc., 273 F. Supp. 2d 914, 915-16 (E.D. Mich. 2002) (same). "Under Michigan law, highly misleading actions give rise to a duty to disclose product defects." *Tapply*, 148 F.4th at 419. A review of Michigan Supreme Court precedent regarding when a duty to disclose arises sufficient to support a claim for silent fraud (i.e., fraudulent concealment) appears— at first glance—to "reveal[] that, *in every case*, the fraud by nondisclosure was based upon statements by the [seller] that were made in response to a *specific inquiry* by the purchaser." *Reid v. Gen. Motors LLC*, 491 F. Supp. 3d 268, 278-79 (E.D. Mich. 2020) (emphasis added) (quoting *M&D, Inc.*, 585 N.W.2d at 39); *see also First Presbyterian Church of Ypsilanti v. H.A. Howell Pipe Organs, Inc.,* No. 07-13132, 2010 WL 973466, at *2 (E.D. Mich. Mar. 16, 2010) (discussing the same); *MacDonald v. Thomas M. Cooley Law Sch.*, 880 F. Supp. 2d 785, 798-99 (W.D. Mich. 2012), *aff'd*, 724 F.3d 654, 666 (6th Cir. 2013) (holding that "[plaintiffs'] failure to inquire dooms [their] silent-fraud claim. Absent such an inquiry, [the defendant] had no duty to make any further disclosure.").

Relying on this authority, Defendant asserts that "a duty to disclose under Michigan's silent fraud doctrine arises *only where* the buyer has made a specific inquiry that would require the seller to disclose the information in order to give a truthful answer." (Doc. No. 29 at 16 (emphasis added)). But the Sixth Circuit—when interpreting Michigan law—has clarified that "[c]onsumers are not . . . required to inquire about a defect to trigger a manufacturer's duty to disclose." *Tapply*, 148 F.4th at 419. Michigan caselaw does not establish "that consumer inquiry [is] the *sole* circumstance imposing a duty to disclose." *Id.* Instead, the Sixth Circuit has clarified that although Michigan caselaw demonstrates that "the duty arises '*most commonly* in a situation where inquiries

are made by the plaintiff,' . . . an inquiry is [not] always required." *Id.* (quoting *Hord*,' 617 N.W.2d at 550). For example, and as is highly relevant here, "[u]nder Michigan law, highly misleading actions give rise to a duty to disclose product defects." *Tapply*, 148 F.4th at 419 (citing *M&D, Inc.*, 585 N.W.2d at 39). Thus, "where a manufacturer has superior knowledge of a defect, not readily available to the consumer, the manufacturer has a duty to disclose." *Id.* (citing *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1291 (E.D. Mich. 2021) (citing *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 553 (W.D. Mich. 1998)); *Estate of Pilgrim v. Gen. Motors LLC*, 596 F. Supp. 3d 808, 824-25 (E.D. Mich. 2022) (finding plaintiffs sufficiently alleged a duty to disclose under Michigan law where the manufacturer had superior knowledge of a defect causing engine parts to explode)).

In the present case, the Court finds that Plaintiff has plausibly suggested that Defendant had a duty to disclose. Plaintiff specifically alleged that Defendant had "superior knowledge of the [Gas Fumes Defect and that such was] not readily available to [Plaintiffs.]" *Tapply*, 148 F.4th at 419 (citations omitted). Moreover, Plaintiffs' First Amended Complaint has numerous factual assertions that support that allegation. (Doc. No. 24 at ¶¶ 96-105). For example, Plaintiffs alleged the following:

> [Defendant] became aware of the Gas Fumes Defect through sources not available to Plaintiffs and Class Members, including, but not limited to, pre-production testing, preproduction design failure mode, and analysis data; production design failure mode, and analysis data; early consumer complaints made exclusively to Nissan's network of dealers, and directly to Nissan; aggregate warranty data compiled from Nissan's network of dealers; testing conducted by Nissan in response to consumer complaints; and repair order, and parts data received by Nissan from Nissan's network of dealers.

(*Id.* at ¶ 97). Because the Court finds that Plaintiffs have alleged factual matter plausibly suggesting Defendant had superior knowledge of the Gas Fumes Defect and that such was not readily

available to Plaintiffs, Plaintiffs have plausibly suggested that Defendant did have a duty to disclose the Gas Fumes Defect to Plaintiff Elias under Michigan law.

Therefore, the Court will deny Defendant's Motion as it relates to Plaintiff Elias's claim for fraudulent concealment (Count II). Relatedly, because Defendant's argument for dismissal of Plaintiff Elias's claim for violation of the Michigan consumer protection statute (Count VI) was premised on Plaintiff Elias's fraudulent concealment claim failing—a premise that has turned out to be flawed—Defendant's request for dismissal of Count VI likewise be denied.

Defendant made the same unavailing argument as grounds for dismissal of Plaintiff Elias's unjust enrichment claim (Count III). But because Defendant proffered an additional reason for dismissal—namely, that Plaintiff Elais's claim of unjust enrichment is precluded by the existence of an express warranty—the Court must first analyze the viability of such alternative reason before deciding whether to grant Defendant's request to dismiss Plaintiff Elias's unjust enrichment claim (Count III)—a task the Court undertakes below in Section I.C.

### 4. Duty to disclose under Minnesota law (Plaintiff Headley)

As Defendant itself admits, under Minnesota law "a duty to disclose may arise if the parties stand in a fiduciary relationship *or if one party 'has special knowledge of material facts to which the other party does not have access.'" Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 812 (Minn. Ct. App. 2010) (emphasis added) (citing *Richfield Bank & Trust Co. v. Sjogren*, 244 N.W.2d 648, 650 (Minn. 1976)).

Arguing that it did not have a duty to disclose, Defendant deploys Defendant's Knowledge Argument, asserting the following:

> As demonstrated above, the [First] Amended Complaint does not contain any factual allegations that support the conclusion [Defendant] knew of the purported defect at the time Plaintiff Headley purchased his vehicle in July 2022. Under Minnesota law, therefore, [Defendant] had no duty to disclose because [Defendant] did not have any special knowledge to disclose at the time of the purchase.

(Doc. No. 29 at 16-17). However, because the Court has already found that Plaintiffs did plausibly plead Pre-Sale Knowledge (*supra* pp. 18-33, Section I.A), any argument premised on Defendant's assertion that it did not have Pre-Sale Knowledge necessarily fails.

Notably, the standard for imposing a duty to disclose under Minnesota law is nearly identical to the Michigan standard discussed above. *Compare Tapply*, 148 F.4th at 419 (finding that under Michigan law  a duty to disclose arises "where [(1)] a manufacturer has superior knowledge of a defect, [(2)] not readily available to the consumer."); *with Driscoll*, 785 N.W.2d at 812 ("[A] duty to disclose may arise if . . . [(1)] one party 'has special knowledge of material facts [(2)] to which the other party does not have access.'" (citing *Richfield Bank & Trust Co.*, 244 N.W.2d at 650)). For the same reasons discussed when analyzing whether a duty to disclose arose under Michigan law (*supra* pp. 41-44, Section I.B.3), the Court likewise finds that a duty to disclose the Gas Fumes Defect to Plaintiff Headley arose under Minnesota law.

In sum, having found Plaintiffs alleged factual matter plausibly suggesting—with the degree of specificity required—that Defendant did have a duty to disclose the Gas Fumes Defect to Plaintiff Headley, the Court will deny Defendant's Motion as it relates to Plaintiff Headley's claim for fraudulent concealment (Count II). Relatedly, because Defendant's argument for dismissal of Plaintiff Headley's claim for violation of the Minnesota consumer protection statute (Count XV) was premised on Plaintiff Headley's fraudulent concealment claim failing—a premise that has turned out to be flawed—Defendant's request for dismissal of Count XV likewise will be denied.

Defendant made the same unavailing argument as grounds for dismissal of Plaintiff Headley's unjust enrichment claim (Count III). But because Defendant proffered an additional reason for dismissal—namely, that Plaintiff Headley's claim of unjust enrichment is precluded by

the existence of an express warranty—the Court must first analyze the viability of such alternative reason before deciding whether to grant Defendant's request to dismiss Plaintiff Headley's unjust enrichment claim (Count III)—a task the Court undertakes below in Section I.C.

### 5. Duty to disclose under New York law (Plaintiff Lawson)

"Under New York law, 'omissions are actionable as a basis for claims of fraud only if the non-disclosing party ha[d] a duty to disclose.'" *Vita v. Gen. Motors, LLC*, No. 20-CV-01032 (JMA) (ARL), 2023 WL 3773530, at *2 (E.D.N.Y. June 2, 2023) (quoting *Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 368-69 (E.D.N.Y. 2022) (internal quotations omitted)). *Accord Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995) ("[A] concealment of facts supports a cause of action for fraud only if the non-disclosing party has a duty to disclose."). "Such a duty *ordinarily* arises where the parties are in a fiduciary or other relationship signifying a heightened level of trust." *Remington Rand Corp.*, 68 F.3d at 1483 (emphasis added). However, even absent a fiduciary relationship, a duty to disclose may arise under New York law "where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair." *Miele v. Am. Tobacco Co.*, 770 N.Y.S.2d 386, 391 (N.Y. App. Div. 2003). *Accord State by Abrams v. Gen. Motors Corp.*, 466 N.Y.S.2d 124, 127 (N.Y. Sup. Ct. 1983) ("If one party has superior knowledge or has means of knowledge not available to both parties, then he is under a legal obligation to speak and the silence would constitute fraud." (citations omitted)); *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 124 (E.D.N.Y. 2011) ("With respect to the duty to disclose, New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge,  such that the transaction without disclosure is rendered inherently unfair." (internal citations and quotations omitted)); *Trahan v. Lazar*, 457 F. Supp. 3d 323, 353 (S.D.N.Y. 2020) ("'a duty to disclose may arise if . . . one party possesses

superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge,' but only 'when it becomes apparent to the non-disclosing party that another party is operating under a mistaken perception of material fact.'" (quoting *Remington Rand Corp.*, 68 F.3d at 1483 (internal quotations and citations omitted))). New York courts have referred to this principle as the "special facts doctrine." *See e.g., Jana L. v. W. 129th St. Realty Corp.*, 802 N.Y.S.2d. 132, 134 (N.Y. App. Div. 2005) ("It is well established that, absent a fiduciary relationship between the parties, a duty to disclose arises only under the 'special facts' doctrine where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair[.]" (internal citations and quotations omitted)); *SSA Holdings LLC v. Kaplan*, 992 N.Y.S.2d 405, 406 (N.Y. App. Div. 2014) ("Nor did the duty to disclose arise under the special facts doctrine, as the complaint does not allege that defendants had superior knowledge of essential facts[.]" (internal citations omitted)).

New York caselaw discussing whether a duty to disclose a defect may be properly imposed on a manufacturer who has "superior knowledge" (i.e., under the "special facts" doctrine) is quite inconsistent internally, with one line of cases answering in the affirmative and imposing a duty on manufacturers to disclose those defects with which they have superior knowledge, while another line of cases appears to state categorically that car manufacturers owe no duty to disclose defects to consumer plaintiffs, because they are not in an "arm's-length transaction" with the consumer.[20]

---

[20] *Compare Woods*, 807 F. Supp. 2d at 125 (denying a motion to dismiss a fraudulent concealment claim brought by a consumer plaintiff against an oven manufacturer, finding that "[a]lthough normally th[e] duty to disclose arises in the context of direct business transactions, courts have also imposed this duty on a manufacturer who has exclusive knowledge of a product defect or danger."); *and Miele,* 770 N.Y.S.2d at 391 (recognizing that cigarette manufacturers have a duty to disclose material facts about the dangers associated with smoking to consumers for the purposes of a fraudulent concealment claim); *Standish-Parkin v. Lorillard Tobacco Co.*, 786 N.Y.S.2d 13, 14-15 (N.Y. App. Div. 2004) (same); *and State by Abrams*, 466 N.Y.S.2d at 127 (recognizing a car manufacturer's duty to disclose defects to consumers for the purposes of a fraudulent concealment claim); *and Kiriacopoulos v. Gen. Motors LLC*, No. CV 22-10785, 2023 WL 2789622, at *9 (E.D. Mich. Apr. 5, 2023) ("a plaintiff properly pleads a duty to disclose under New York

The Court is persuaded by the former line of cases, finding the latter to be conclusive and unsupported by established New York law.[21]

Therefore, the Court finds that under New York Law and in accordance with the special facts doctrine, a manufacturer does have a duty to disclose those defects with which the manufacturer has superior knowledge. *See Woods*, 807 F. Supp. 2d at 125 (collecting cases)

---

law under [the superior knowledge] standard if he or she has 'plausibly alleged that [the manufacturer] had superior knowledge of the Defect.'" (quoting *Cohen v. Subaru of Am., Inc.*, No. 120CV08442JHRAMD, 2022 WL 721307, at *23 (D.N.J. Mar. 10, 2022)); *with Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212 (S.D.N.Y. 2015) (dismissing the plaintiffs' fraudulent concealment claim, finding that the plaintiffs had not adequately alleged that the manufacturer had a duty to disclose, reasoning that a duty to disclose arising from "superior knowledge" may only be "impose[d] . . . on a *seller* in an arm's-length transaction." (emphasis added)); *and Vita*, 2023 WL 3773530, at *2 (finding that in "design defect-related claims brought against car manufacturers [specifically] . . . courts have determined that car manufacturers owed no duty to disclose defects to consumer plaintiffs.").

[21] The assertion that New York law only imposes a duty to disclose arising from "superior knowledge" "on a seller in an arm's-length transaction," arises from *Garcia*. In *Garcia*, the court stated that "those states that recognize a duty to disclose arising from 'superior knowledge' only impose such a duty on a seller in an arm's-length transaction." 127 F. Supp. 3d at 237. In reaching such conclusion, the court in *Garcia* cited no New York law that would support such assertion—none of the cases cited by *Garcia*, including *Grand Union Supermarkets of the V.I., Inc. v. Lockhart Realty Inc.*, 493 F. App'x 248, 252 (3d Cir. 2012), limit imposition of a duty to disclose arising from "superior knowledge" to sellers in an arm's-length transaction. *See e.g., Grand Union Supermarkets*, 493 F. App'x at 252 (explaining that a duty to disclose under New York law can arise under the "special facts" doctrine, nowhere limiting application of such to sellers in an arm's-length transaction). To the contrary, one of the cited cases explicitly establishes that whether there is an arm's-length relationship may affect whether there is a duty to disclose based upon a *fiduciary relationship*, but has no bearing on whether a duty to disclose arises under the *special facts doctrine* (i.e., based on superior knowledge). *Swersky v. Dreyer & Traub*, 643 N.Y.S.2d 33, 37 (N.Y. App. Div. 1996) ("Although the arm's length nature of this transaction negates any alleged duty to disclose based upon a fiduciary relationship, there is still an outstanding issue as to whether [the defendant] had a duty to disclose. . . . [u]nder the 'special facts' doctrine."). Therefore, the Court finds that the assertion in *Garcia*— that New York law only imposes a duty to disclose arising from "superior knowledge" on a seller in an arm's-length transaction—is unpersuasive.

The Court instead finds that under established New York law—by way of the special facts doctrine—a duty to disclose can be properly imposed on manufacturers (irrespective of whether they were in an arm's-length transaction with the plaintiff), so long as the manufacturer has superior knowledge of the defect. *Cf Woods*, 807 F. Supp. 2d at 125 (denying a motion to dismiss a fraudulent concealment claim brought by a consumer plaintiff against an oven manufacturer, finding that "[a]lthough normally th[e] duty to disclose arises in the context of direct business transactions, courts have also imposed this duty on a manufacturer who has exclusive knowledge of a product defect or danger."); *Kiriacopoulos*, 2023 WL 2789622, at *9 ("a plaintiff properly pleads a duty to disclose under New York law under [the superior knowledge] standard if he or she has 'plausibly alleged that [the manufacturer] had superior knowledge of the Defect.'" (quoting *Cohen*, 2022 WL 721307, at *23).

("[a]lthough normally this duty to disclose [due to superior knowledge] arises in the context of direct business transactions, courts have also imposed this duty on a manufacturer who has exclusive knowledge of a product defect or danger."). *Accord Cohen*, 2022 WL 721307, at *23. For the same reasons discussed when analyzing whether a duty to disclose arose under Michigan law and Minnesota law (*supra* pp. 41-46, Sections I.B.3 and I.B.4)—two states that similarly impose a duty to disclose based on superior knowledge—the Court likewise finds that Defendant did have a duty to disclose the Gas Fumes Defect to Plaintiff Lawson under New York law.

In sum, having found Plaintiffs alleged factual matter plausibly suggesting—with the degree of specificity required—that Defendant did have a duty to disclose the Gas Fumes Defect to Plaintiff Lawson, the Court will deny Defendant's Motion as it relates to Plaintiff Lawson's claim for fraudulent concealment (Count II). Relatedly, because Defendant's argument for dismissal of Plaintiff Lawson's claim for violation of the New York Consumer Protection statute (Count XII) was premised on Plaintiff Lawson's fraudulent concealment claim failing—a premise that has turned out to be flawed—Defendant's request for dismissal of Count XII will likewise be denied.

Defendant made the same unavailing argument as grounds for dismissal of Plaintiff Lawson's unjust enrichment claim (Count III). But because Defendant proffered an additional reason for dismissal—namely, that Plaintiff Lawson's claim of unjust enrichment is precluded by the existence of an express warranty—the Court must first analyze the viability of such alternative reason before deciding whether to grant Defendant's request to dismiss Plaintiff Lawson's unjust enrichment claim (Count III)—a task the Court undertakes below in Section I.C.

### C. Plaintiffs' Unjust Enrichment Claims (Count III)

Defendant alternatively asserts that Plaintiffs' claims for unjust enrichment (Count III) should be dismissed because "[t]he laws of each relevant state bars claims for unjust enrichment where an express contract governs the relationship between plaintiff and defendant." (Doc. No. 29 at 17). More specifically, Defendant asserts that because "the Limited Warranty governs the relationship between Plaintiffs and [Defendant] . . . Plaintiffs' unjust enrichment claims should be dismissed." (*Id.* at 17-18). Plaintiffs counter this argument by asserting that they are "pursu[ing] their unjust enrichment claim[s] in the alternative to their breach of warranty claims." (Doc. No. 34 at 14). The Court is unpersuaded by Plaintiffs' stated argument, not least because absolutely nothing in the First Amended Complaint indicates that, or in what sense, Plaintiffs' unjust enrichment claim[s] are being pursued in the alternative to their breach of warranty claims. Nevertheless, the Court finds that the unjust enrichment claims survive the Motion because the Limited Warranty does not govern the conduct underlying the unjust enrichment claims.

Plaintiffs bring their respective individual[22] unjust enrichment claims under Illinois, Iowa, Michigan, Minnesota, and New York law. [23] Notably, each state limits one's ability to bring a claim for unjust enrichment if there is a contract governing the "same subject matter." *See e.g. First Midwest Bank v. Cobo*, 90 N.E.3d 567, 575 (Ill. App. Ct. 2017) (stating that under Illinois law "a party cannot state a claim for unjust enrichment where an express contract exists between the parties and *concerns the same subject matter*." (emphasis added) (citation omitted)); *Kunde v. Estate of Bowman*, 920 N.W.2d 803, 807 (Iowa 2018) (holding that, under Iowa law, "[a]n express contract and an implied contract cannot coexist with respect to the *same subject matter*." (emphasis added added) (quoting *Chariton Feed and Grain, Inc. v. Harder*, 369 N.W.2d 777, 791 (Iowa 1985)); *Zwiker v. Lake Superior State Univ.*, 986 N.W.2d 427, 482 (Mich. Ct. App. 2022) (stating

---

[22] Notably, in addition to Plaintiffs bringing claims of unjust enrichment on their own behalf, they also brought such on behalf of the Nationwide Class. (Doc. No. 24 at p. 52). Defendant briefly challenges the Nationwide Class's claim of unjust enrichment in its Memorandum, stating that, "[p]resumably any such claim would rely upon the state law of one of the Plaintiffs' home states; however, Plaintiffs fail to state a claim under any of the possible statutes." (Doc. No. 29 at 19 n.3). The Court finds such argument unavailing in light of its decision that each Plaintiff has plausibly pled a claim of unjust enrichment under the laws of his or her state.

It is worth addressing Defendant's comment that the Nationwide Class's claim for unjust enrichment is "presumably [based] . . . upon the state law of one of the Plaintiffs' home states." (*Id.*). To the contrary, the Court finds that the Nationwide Class's claim for unjust enrichment need not be based upon the state law of one of the Plaintiffs' home states. Rather, relying on persuasive authority, the Court finds that at the motion-to-dismiss stage, Plaintiffs can assert claims on behalf of a nationwide class under the laws of states other than their own. *Cf Kiriacopoulos*, 2023 WL 2789622, at *17 (holding that any argument over whether the plaintiffs can assert claims on behalf of a nationwide class "is properly suited for consideration at the Rule 23 class certification stage, not the pleading stage." (citing *Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 495 (E.D. Mich. 2021) (holding that plaintiffs, who alleged warranty claims under various states' laws, could assert claims on behalf of a nationwide class under the laws of states other than their own at the motion-to-dismiss stage, stating: "[A]s long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3) . . . ."))).

[23] As discussed above (*supra* p. 18 n.8), neither party addresses choice of law, but instead simply assumes that the law where each Class Vehicle was purchased applies to each of Plaintiffs' individual unjust enrichment claims. Therefore, as the parties assume that the law where each Class Vehicle was purchased applies, the Court will do the same without further analysis

that under Michigan law, "[c]ourts may not imply a contract under an unjust-enrichment theory if there is an express agreement covering the *same subject matter*." (emphasis added) (citation omitted)); *Alben v. Mahoney & Emerson*, No. A05-256, 2006 Minn. App. Unpub. LEXIS 106, at *8 (Minn. Ct. App. Jan. 31, 2006) ("The Minnesota Supreme Court has stated that, 'where there is an express contract, there can be no contract implied in fact or quasi contractual liability with respect to the *same subject matter*.'" (emphasis added) (quoting *Schimmelpfennig v. Gaedke*, 27 N.W.2d 416, 420-21 (Minn. 1947) (citation omitted)); *EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 26, 33-34 (N.Y. 2005) (holding that under New York law, "the existence of a valid contract governing *the subject matter* generally precludes recovery in quasi contract for events arising out of the *same subject matter*." (emphasis added) (citation omitted)). What is meant by "the same subject matter" is of major consequence in assessing whether Plaintiffs' claims of unjust enrichment are precluded by the existence of the Limited Warranty.

Understanding the rationale behind the "same subject matter" rule helps to understand what is meant by "the same subject matter." Courts have historically prohibited claims for unjust enrichment when an express contract exists governing the same subject matter, finding that such relief should not be granted when the rights of the parties are governed by a valid contract. *Cf Ulanowski v. Nepper*, No. A10-2198, 2011 WL 3903234, at *3 (Minn. Ct. App. Sept. 6, 2011) ("[A] valid contract governing the rights and obligations of the two parties precludes an unjust-enrichment claim." (*Stein v. O'Brien,* 565 N.W.2d 472, 474-75 (Minn. Ct. App. 1997)); *High Concept Holdings, Inc. v. CarMedix, Inc.*, No. 1-18-0075, 2019 WL 2256812, at *9 (Ill. App. Ct. May 22, 2019) ("The rationale is that contracting parties should be held to their agreement[.]"); *Hamilton v. Jeannot*, No. 321592, 2015 WL 5167914, at *3 (Mich. Ct. App. Sept. 3, 2015) ("Because there can be no unjust enrichment where there is an explicit contract governing the

parties' relationship, the court explained, [the plaintiff's] unjust enrichment claim failed as a matter of law."); *Kunde*, 920 N.W.2d at 808 ("The existence of an express contract on these matters prevents [the plaintiff] from circumventing their agreement by seeking to use theories of unjust enrichment and quantum meruit to recover for improvements to which he was plainly not entitled under the terms of the contract."); *V.K. v. J.K.*, 2022 N.Y. Slip Op. 51291(U) (N.Y. Sup. Ct. 2022) ("[A] complainant may not recover based upon an unjust enrichment claim when they can recover pursuant to a contractual claim." (citing *ClarkFitzpatrick, Inc. v Long Is. R.R. Co.*, 70 N.Y.2d 382, 388 (N.Y. 1987) ("[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter"))). It would then logically follow that—even when there is an express contract— if the complained of conduct is not governed by the terms of the express contract, then a plaintiff's claim for unjust enrichment should not be precluded by virtue of the express contract's existence.

In the present case, the Court finds that although there exists an express contract (i.e., the Limited Warranty) between the parties, the express contract concerns a different subject matter in that it does not govern the complained-of conduct. The conduct underlying Plaintiffs' unjust enrichment claims is Defendant's failure to disclose the Gas Fumes Defect. (Doc. No. 24 at pp. 52-53). More specifically, Plaintiffs took issue with Defendant's nondisclosure of the Gas Fumes Defect prior to Plaintiffs' purchase of the Class Vehicles, alleging that Defendant was unjustly enriched as a result of its nondisclosure. (*Id.* at ¶¶153-54).

The alleged wrongful conduct (i.e., the non-disclosure of the Gas Fumes Defect) occurred in part prior to the sale of the Class Vehicles. This matters because, the Limited Warranty creates certain obligations on the part of Defendant beginning "on the date the vehicle is delivered to the first retail buyer or put into use, whichever is earlier." (Doc. No. 29-3 at 11). Put another way, the

Limited Warranty creates certain obligations on the part of Defendant and governs the conduct of Defendant *post-sale*—namely that Defendant make certain repairs if necessary. Therefore, the Limited Warranty does not govern Defendant's pre-sale conduct—including Defendant's failure to disclose the Gas Fumes Defect—but instead governs Defendant's post-sale behavior. Therefore, the Court finds that the Limited Warranty does not cover the "same subject matter" as Plaintiffs' unjust enrichment claims.

In stating this conclusion, the Court emphasizes that the determination of whether two things are "the same" is often a judgment call. The undersigned has previously taken the time to discuss the difficulty in assessing whether two things are "the same," explaining that such a determination often is debatable and ultimately a "judgment call." *See* Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 MISS. L.J. 41, 70 (1995). "[A] subtle, inscrutable continuum runs from 'different,' through 'similar,' to 'same.'" *Id.* Ultimately, "sameness is in the eye of the beholder; what one person considers 'the same' might not be 'the same' to someone else." *Id.* Therefore, resolving whether something is "the same" "involves a subjective judgment call as to whether two items are sufficiently close to the 'same' end of that continuum that they should be labeled 'the same.'" *Id.* Here, it falls to the undersigned to make that judgment call, and he calls it like he sees it. Ultimately, the Court finds that the subject matter of the Limited Warranty—which governs post-sale conduct—is not sufficiently close to the subject matter of the claims for unjust enrichment—which is premised on Defendant's pre-sale conduct. Therefore, the two should not be labeled as concerning "the same" subject matter.

Therefore, the Court finds that the existence of the Limited Warranty does not preclude Plaintiffs' claims for unjust enrichment (Count III) So, the Court will deny the Motion with respect to Plaintiffs' claims for unjust enrichment (Count III).

**II.        Breach of Express-Warranty Claims (Counts V, VII, IX, XI, and XIV)**

Each of the Named Plaintiffs brings a state law claim for breach of express warranty (i.e., the Express-Warranty Claims). Defendant brings two alternative arguments in support of dismissing Plaintiffs' Express-Warranty Claims: (1) "[Defendant] did not breach the Limited Warranty" (Doc. No. 29 at 19); and alternatively (2) "Plaintiffs' claims for breach of express warranty should be dismissed because Plaintiffs fail to meet their own contractual obligations under the Limited Warranty" (*Id.* at 20-21). (The Court refers to these respectively as "Argument 1," and "Argument 2").  The Court will address each argument in turn.

### A.  Argument 1—Breach of the Warranty

In support of Argument 1 (i.e., that it did not breach the Warranty), Defendant asserts that "[u]nder the laws of each of the respective states, a limited warranty is only breached if repairs are not successfully undertaken within a reasonable time or within a reasonable number of attempts." (Doc. No. 29 at 19).[24] Put another way, according to Defendant, a limited warranty is breached

_____

[24] Defendant provides the following string cite in support of its assertion that "[u]nder the laws of each of the respective states, a limited warranty is only breached if repairs are not successfully undertaken within a reasonable time or within a reasonable number of attempts" (Doc. No. 29 at 19):

> *Pearson v. DaimlerChrysler Corp.*, 813 N.E.2d 230, 237 (Ill. App. Ct. 2004),' (an element of a breach of limited written warranty is that the defendant "was unable to repair the defect after a reasonable time or a reasonable number of attempts."), *as modified on denial of reh'g* (July 22, 2004); *Adrian Trucking, Inc. v. Navistar, Inc.*, 609 F. Supp. 3d 728, 741 (N.D. Iowa 2022) ("A repair or replace limited remedy may fail when the seller is given a reasonable chance to correct defects and the equipment still fails to function properly." (internal quotation omitted)); *Computer Network, Inc. v. AM Gen. Corp.*, 696 N.W.2d 49, 55 (Mich. Ct. App. 2005) (a warrantor "must repair or replace the parts within a reasonable time."); *Polzin v. Chrysler Grp. LLC,* No. A09-405, 2010 WL 2035617, at *4 (Minn. Ct. App. May 25, 2010) (same).

 (*Id.* (cleaned up)). Ultimately, because the parties do not appear to dispute that—under the applicable state laws—a limited warranty is breached only if the repairs are not successfully undertaken within a reasonable time, the Court accepts the truth of that proposition and focuses on whether Plaintiff has adequately alleged that repairs were not successfully undertaken within a reasonable time.

only if repairs are not made within a reasonable amount of time. Further according to Defendant, the Warranty in this case was not breached, because (again according to Defendant), Plaintiff did not adequately allege that repairs were not successfully undertaken within a reasonable amount of time.

Although Plaintiffs do not appear to dispute Defendant's stated rule for when a limited warranty is breached under the laws of the respective states, Plaintiffs do dispute the outcome of the application of that rule here, asserting that Defendant breached the Warranty. (Doc. No. 34 at 15). More specifically, Plaintiffs argue that they "provided [Defendant] with notice of the defect and a reasonable opportunity to repair it . . . but [Defendant] breached its warranty because it has failed to repair the Class Vehicles." (*Id.*). Given the current posture of the case, the question of consequence is whether Plaintiffs have alleged factual matter plausibly suggesting that Defendant failed to repair the Gas Fumes Defect within a reasonable time (thereby breaching the Warranty). In this context, factual matter plausibly suggests that Defendant did not repair the Gas Fumes Defect in a reasonable time if it provides a sufficient basis for a reasonable jury to find that Defendant did not repair the Gas Fumes Defect in a reasonable time.

Notably, Plaintiffs alleged that upon discovering the Gas Fumes Defect, they took their Class Vehicles to be inspected and repaired. (Doc. No. at ¶¶ 27, 39, 49, 63, 73, and 83). Plaintiffs alleged that the first of the Named Plaintiffs to seek repair sought repair beginning in the Fall of 2022 (*id.* at 83), while the last of the Named Plaintiffs sought repair beginning on April 13, 2023 (*id.* at ¶ 73). In response to their repair requests, Plaintiffs alleged that they received a variety of responses, but most notably, the Named Plaintiffs were each told that Defendant was aware of the Gas Fumes Defect but had no fix for the issue, (*id.* at ¶¶ 27, 39, 63, 73, and 84). More specifically, Plaintiff Wemer alleged that when she reached out to a registered Nissan dealer to schedule a

warranty repair appointment, the registered Nissan dealer "refused to schedule a warranty repair appointment and claimed that there were [sic] no repair available," (*id.* at ¶ 41); the Gallinas alleged that were told they "should pick up their car and await on a fix from [Defendant]," (*id.* at ¶ 50); and both the Gallinas and Plaintiff Elias received unsuccessful repair attempts from their respective registered Nissan dealers. (*id.* at ¶¶ 29-30 and 54-55). Notably, Plaintiffs alleged that as of August 14, 2023—the date the First Amended Complaint was filed—Defendant had not "recalled the Class Vehicles to repair the Gas Fumes Defect, ha[d] not offered to its customers a suitable repair or replacement parts related to the Gas Fumes Defect free of charge, and ha[d] not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Gas Fumes Defect." (*Id.* at ¶ 116). Accepting Plaintiffs' aforementioned factual allegations as true—which the Court must at the present (motion-to-dismiss) phase—Defendant was given multiple months to repair the Gas Fumes Defect and yet still has not repaired the Gas Fumes Defect. Ultimately, the Court finds that the facts as pled are sufficient to survive the Motion because they plausibly suggest that Defendant did not repair the Gas Fumes Defect within a reasonable time.

In support of Argument 1, Defendant challenges Plaintiffs' factual assertions by providing the Court with its version of the facts. For example, Defendant appears to refute Plaintiffs' assertions that Defendant has refused to repair the Class Vehicles and still has failed to adequately repair the Class Vehicles. (Doc. No. 36 at 3-4). But the purpose of a motion to dismiss is merely to test the sufficiency of the complaint. *See Gardner v. Quicken Loans, Inc.*, 567 F. App'x 362, 364 (6th Cir. 2014) ("Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint."). Thus, "[i]t is the Plaintiff's version of the facts which must survive Rule(12)(b)(6) muster, not that of the Defendants." *Nickell v. Linton*, No. CIV.A. 14-117-HRW, 2015 WL 789219, at *2 (E.D. Ky.

Feb. 24, 2015). Therefore, at the present (motion-to-dismiss) phase, the Court will not consider Defendant's added (alleged) facts but rather considers only the factual allegations made in Plaintiffs' First Amended Complaint.[25]

For all of these reasons above, the Court finds that Argument 1 does not support dismissal of Plaintiffs' Express-Warranty Claims.

### B.   Argument 2—Contractual Obligation under the Warranty

Defendant alternatively argued that Plaintiffs' Express-Warranty Claims should be dismissed because "Plaintiffs fail to meet their own contractual obligations under the Limited Warranty." (Doc. No. 29 at 20-21). In its Memorandum, Defendant points the Court to a portion of the Warranty that states that an owner is "required to first use [the Better Business Bureau's] BBB AUTO LINE[26] in good faith if [they] seek remedies created by state laws," (*id.* at 21 (quoting Doc. No. 29-3 at 10)); however, the cited portion is incomplete. In reality, the Warranty states that "you are required to first use BBB AUTO LINE in good faith if you seek remedies created by state law . . . *if applicable state law provides for using a 703 compliant or similar process before filing suit*." (Doc. No. 29-3 at 10 (emphasis added)). Importantly, the emphasized portion limits when an owner is required to utilize the BBB AUTO Line settlement mechanism prior to filing suit. Defendant ignores this limitation and instead asserts broadly that the Warranty requires owners to utilize the BBB AUTO Line settlement mechanism prior to bringing *any state law claim*. But, again, the terms of the Warranty make clear that an owner is required to utilize the BBB AUTO

---

[25] Notably, although Defendant will later have the opportunity to proffer evidence tending to establish that its repair efforts were reasonable, Defendant is afforded no such opportunity at the present (motion-to-dismiss) phase. *Cf Munoz v. Strong*, No. 1:20-CV-984, 2021 WL 5548081, at *2 (W.D. Mich. June 23, 2021) ("Maybe the defense["s] view of the facts will ultimately be vindicated, but in considering a Rule 12(b)(6) motion, the Court must accept the plaintiff's version.").

[26] "BBB AUTO LINE is an informal dispute settlement mechanism." (Doc. No. 29-3 at 8).

Line settlement mechanism only if the owner is planning to bring a claim under state law that itself provides for a similar process before filing suit.

Importantly, Defendant has the burden of explanation—meaning that Defendant has the obligation of explaining why Plaintiffs were required to utilize the BBB AUTO Line settlement mechanism prior to filing their Express-Warranty Claims. Defendant has failed to meet that burden. Although Defendant conclusively states its belief that Plaintiffs were required to utilize the BBB AUTO Line settlement mechanism prior to filing their Express-Warranty Claims, Defendant wholly fails to provide any support for such conclusion considering the limiting language that defendant ignored. Although it is possible that the applicable state laws "provide[] for using a 703 compliant or similar process before filing suit" (Doc. No. 29-3 at 10 (emphasis added))—which would in turn mean Plaintiffs were required to utilize the BBB AUTO Line settlement mechanism per the Warranty—Defendant has wholly failed to make such argument and the Court declines to do so on Defendant's behalf. *Cf Boynton v. Headwaters, Inc.*, 737 F. Supp. 2d 925, 930 (W.D. Tenn. 2010) ("It is not [a court's] job, especially in a counseled civil case, to create arguments for someone who has not made them. . . ." (quoting *Yeomalakis v. FDIC,* 562 F.3d 56, 61 (1st Cir. 2009))); *see also Rop v. Fed. Hous. Fin. Agency*, 50 F.4th 562, 583 n.8 (6th Cir. 2022) (Thapar, J., dissenting) ("It's not the court's job to invent arguments for parties. Since [the defendant] did not develop the . . . argument, I will not either."). And in any event, it is virtually certain that such an effort would fail because the First Amended Complaint (which of course is all that the Court can consider at this stage) plainly contains no facts to support such an argument.

In sum, the Court finds that Defendant has failed to explain adequately that Plaintiffs were required to utilize the BBB AUTO Line settlement mechanism prior to filing their Express-

Warranty Claims. Therefore, the Court finds that Argument 2—as currently written—does not support dismissal of Plaintiffs' Express-Warranty Claims.[27]

Therefore, having found that neither of Defendant's arguments (i.e., Argument 1 nor Argument 2) support dismissal of Plaintiffs' Express-Warranty Claims, the Court will deny the Motion with respect to Plaintiffs' Express-Warranty Claims.

### III.        Breach of Implied-Warranty Claims (Counts IV and XIII)

Plaintiff Elias and Plaintiff Headley each brought claims for breach of the implied warranty of merchantability (i.e., the Implied-Warranty Claims). (Doc. No. 24 at pp. 53-54 and 70-71). Plaintiff Elias brought his claim pursuant to Michigan law, (*id.* at pp. 53-54), and Plaintiff Headley brought his claim pursuant to Minnesota law, (*id.* at pp. 70-71).

Defendant attacks the Implied-Warranty Claims on two fronts. (Doc. No. 29 at 21-24). First, Defendant argues that the Implied-Warranty Claims must fail because "Plaintiffs fail to sufficiently allege their vehicles are unfit for their ordinary purposes." (*Id.* at 22). Second, Defendant argues that "Plaintiffs cannot stand on a claim of breach of implied warranty when they themselves have made the decision not to receive the available repair." (*Id.* at 24). Although Defendant argues that there is a repair available to remedy the Gas Fumes Defect (*id.*), Plaintiffs pled that Defendant has not offered a suitable repair (Doc. No. 24 at ¶ 116). Although Defendant's assertion may ultimately prove to be true, at the present (motion-to-dismiss) phase, the Court must accept Plaintiffs'—rather than Defendant's—factual allegations as true. *See Iqbal*, 556 U.S. at 678 (holding that at the motion-to-dismiss phase, the Court must "accept as true all of the allegations contained in [the] complaint'"); *See also In re Amcast Indus. Corp.*, 365 B.R. 91, 111 (Bankr. S.D.

---

[27] Of course, the Court's holding here does not foreclose Defendant from asserting later (with evidentiary support) that Plaintiffs are in fact subject to the BBB AUTO Line settlement mechanism and presenting arguments based on that assertion.

Ohio 2007) ("While the Defendants' factual allegations and materials will certainly be relevant at trial, the court is precluded from considering them on a Rule 12(b)(6) dismissal motion."); *Perkins v. S & E Flag Cars, LLC*, No. 2:15-CV-975, 2017 WL 1093279, at *3 (S.D. Ohio Mar. 22, 2017) ("The Court, however, does not weigh conflicting factual assertions when deciding a motion to dismiss under Rule 12(b)(6). The Court accepts all of Plaintiffs' well-pleaded factual allegations as true."). Therefore, at the present stage, the Court cannot countenance Defendant's assertion that there is a repair available, and any argument premised on that assertion is unavailing.

Further, the Court disagrees with Defendant's argument that Plaintiffs have failed "to sufficiently allege their vehicles are unfit for their ordinary purposes." (Doc. No. 29 at 22). Under both Michigan and Minnesota law, the implied warranty of merchantability requires goods to be fit for the ordinary purposes for which such goods are used. *See Bosway Tube & Steel Corp. v. McKay Mach. Co.*, 237 N.W.2d488, 490 (Mich. Ct. App. 1975) ("Under the implied warranty of merchantability, the seller warrants that the goods are 'fit for the ordinary purposes for which such goods are used'" (quoting MCLA 440.2314(2)(c); MSA 19.2314(2)(c))); *see also Daigle v. Ford Motor Co.*, 713 F. Supp. 2d 822, 826 (D. Minn. 2010) ("Under Minnesota law, an implied warranty of merchantability requires that goods be 'fit for the ordinary purposes for which such goods are used.'" (quoting Minn. Stat. § 336.2-314(2)(c))). Plaintiffs alleged that, "[a]s applied to cars, the implied warranty of merchantability is simply a guarantee that the vehicle operates in a 'safe condition' or provides 'safe transportation.'" (Doc. No. 34 at 19 (quoting *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 112 (E.D. Mich. 2019)).[28] In applying that

---

[28] In the context of vehicles, courts—including Michigan courts—have explicitly found that a vehicle is merchantable if it provides safe, reliable transportation. *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 785 (E.D. Mich. 2019) ("[C]ars are not merchantable merely because they are able to provide transportation. Rather, to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects.") (denying motion to dismiss multiple state-law implied-

standard, Plaintiffs alleged that they sufficiently pled that the Class Vehicles are not merchantable by alleging that the "the Gas Fumes Defect is a safety defect." (Doc. No. 34 at 19).

In opposition, Defendant argues that Plaintiffs' allegations "make clear they actually allege only inconvenience and mild discomfort." (Doc. No. 29 at 22-23). This argument founders, however, because the Court finds that Plaintiffs have adequately pled that the Gas Fumes Defect would qualify as a safety hazard. Plaintiffs alleged that "engine defect and resulting strong fuel odor throughout the interior of the vehicle makes Class Vehicle owners physically ill and is a fire safety hazard." (Doc. No. 24 at ¶ 3). More specifically, Plaintiffs alleged that Class Vehicle owners have complained that the Gas Fumes Defect causes owners and their children to be "sick" and make their "eyes water," and results in headaches, nausea, light-headedness and dizziness. *Id.* Plaintiffs further alleged that the Gas Fumes Defect makes the Class Vehicles unsafe because "whenever fuel vapor is present in an enclosed space, such as Class Vehicles' engine compartment or the garage where such vehicles are parked, such fuel vapor is highly combustible and one little spark is all that it takes to ignite such fuel vapors." (*Id.* ¶ 90). Although Defendant argues that Plaintiffs' allegations are insufficient to establish that the Class Vehicles are unfit for their ordinary purpose, Defendant fails to provide any citation in support of its assertion that (accepting Plaintiffs' allegations as true) the Class Vehicles nevertheless are merchantable (i.e., fit for their ordinary purpose of providing *safe* and reliable transportation). Aside from Defendant's introductory

---

warranty claims, including under Michigan law); *see also In re FCA US LLC Monostable Elec. Gearshift Litig.*, 332 F.R.D. 96, 111-113 (E.D. Mich. 2019) (collecting cases).

  "Although the Minnesota caselaw addressing implied-warranty claims based on vehicle sales does not state a clear definition of merchantability in that context," Minnesota courts have acknowledged the standard used by other courts stating that "courts in other jurisdictions have held that a vehicle is merchantable if it provides safe, reliable transportation." *Tellinghuisen v. Chrysler Group, LLC*, No. A13-2194, 2014 Minn. App. Unpub. LEXIS 967, at *6 (Minn. Ct. App. Sept. 2, 2014). Therefore, the Court finds that courts in Minnesota also appear to follow the rule that a vehicle is merchantable if it provides safe, reliable transportation.

citations tending to establish what the implied warranty of merchantability is, and that in the context of vehicles such warranty imposes the requirement that vehicles be safe, (Doc. No. 29 at 22-23), Defendant wholly fails to provide any citations supporting its position that Plaintiffs' allegations are not sufficient to render the Class Vehicles unmerchantable.

As noted numerous times above, Defendant has the burden of explanation for why the Gas Fumes Defect does not render the Class Vehicles unmerchantable (i.e., why the Gas Fumes Defect should not qualify as a safety defect) even accepting Plaintiffs' allegations as true. *Total Benefits Planning Agency, Inc.,* 552 F.3d at 434 ("The moving party has the burden of proving [meaning, in this context, explaining] that no claim exists."). And "[i]t is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to put flesh on its bones." *Meridia Prods. Liab. Lit. v. Abbott Labs*., 447 F.3d 861, 868 (6th Cir. 2006) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)). "[A] court does not serve as the parties' research assistant, doing the work they cannot be bothered to do: it is emphatically not [the] court's responsibility to research and construct the parties arguments." *Ruckman v. PHH Mortg. Corp.*, No. 5:21-CV-00923, 2022 WL 11218098, at *4 (N.D. Ohio Oct. 19, 2022) (quoting *In re Khan*, No. 20B17315, 2021 WL 5121894, at *1 (Bankr. N.D. Ill. Sept. 7, 2021) (citations and quotations omitted)).

Although it is certainly possible there is authority that could support Defendant's position, Defendant fails to cite any, and the Court declines to research and construct Defendant's argument on its behalf. Rather, "draw[ing] on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, as the Court must at the motion-to-dismiss phase, the Court finds that it is reasonable to conclude from Plaintiffs' factual allegations that the Gas Fumes defect would qualify as a safety defect and thus render the Class Vehicles unmerchantable. More specifically, the Court finds that Plaintiffs have alleged factual matter tending to suggest that the Gas Fumes Defect made the Class

Vehicles unsafe to drive based on the possibility that the gas fumes could result in combustion and made owners dizzy and lightheaded.

In further support of the Court's conclusion is persuasive authority tending to establish that "whether a defect is so severe that 'the cars at issue could not be said to provide safe, reliable transportation' is a question of fact for the jury." *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 879 (N.D. Cal. 2018) (quoting *In re MyFord Touch Consumer Litig.*, 46 F.Supp.3d at 980). Ultimately, the Court finds that it is too early to decide conclusively that the Gas Fumes Defect is not a safety defect, especially in light of the factual allegations proffered by Plaintiffs and the lack of support provided by Defendant for its argument

For all of these reasons, the Court will deny the Motion with respect to the Implied-Warranty Claims.

## IV. Magnuson-Moss Warranty Act Claims (Count I)

Defendant's primary argument for why the MMWA Claims should be dismissed is that the First Amended Complaint "fails to allege underlying claims for breach of express or implied warranty." (Doc. No. 29 at 24). However, as discussed above, the Court finds that the First Amended Complaint did plausibly allege claims for breach of express and implied warranty. So Defendant's primary argument for dismissal of the MMWA Claims fails.

Defendant alternatively argues that "the MMWA [C]laims based on express warranty also fail because Plaintiffs have not complied with the informal alternative dispute resolution mechanism provided for in the Limited Warranty." (*Id.* at 24-25). This argument likewise fails. In relevant part the Warranty states that "*[i]n states where BBB AUTO LINE is available*, you are required to use BBB AUTO LINE before exercising rights or seeking remedies under Title I of the Federal Magnuson-Moss Warranty Act, 15 U.S.C. §2301, et seq." (Doc. No. 29-3 at 8 (emphasis

added)). Notably, the Warranty goes on to explicitly state that "BBB AUTO LINE may not be available in all states." (*Id.*). Although Defendant conclusively states that the Warranty required Plaintiffs to comply with the informal alternative dispute resolution (the BBB AUTO LINE) mechanism specified in the Limited Warranty, Defendant has failed to establish or support such assertion because Defendant has not even attempted to show that the BBB AUTO LINE was available in the states where Plaintiffs resided—a prerequisite under the Warranty to the owner being required to use the BBB AUTO LINE (Doc. No. 29-3 at 8). In any event, any attempt would have failed because the showing would have to be made from the contents of the First Amended Complaint—which indicates nothing at all (either way) on this issue. Therefore, the Court finds this argument to be without merit.

In sum, the Court finds that neither of Defendant's arguments support dismissal of the MMWA Claims. So the Court will deny the Motion with respect to the MMWA Claims.

CONCLUSION

For the reasons indicated herein, Defendant's Motion to Dismiss (Doc. No. 28) will be **granted in part and denied in part**. The Court will **GRANT** Defendant's Motion as it relates to Plaintiff Hall's and the Iowa class's claims for fraudulent concealment (Count II), but will **DENY** Defendant's Motion as it relates to the other Named Plaintiffs' and the Nationwide Plaintiffs' claims for fraudulent concealment (Count II). The Court will further **DENY** Defendant's Motion as it relates to Counts I, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, and XV.

An appropriate corresponding order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE